HOWARD WELBORN v. STATE.

No. A-9653.   Aug. 7, 1940.

(105 P. 2d 187.)

98

Purman Wilson and W. G. Long, both of Purcell, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. In the information in this case, filed in the district court of Coal county, Howard Welborn was charged with the crime of murder, alleged to have been committed in said county on or about the 7th day of June, 1938, by then and there unlawfully, and feloniously, without authority of law and with a premeditated design to take the life of Stella Thomas, by shooting said Stella Thomas with a 38-caliber Colt pistol, thereby inflicting upon the body of the said Stella Thomas, certain mortal

wounds, of which mortal wounds so inflicted she, the said Stella Thomas, did die.

Upon his trial the jury by their verdict found him guilty of manslaughter in the first degree, and fixed his punishment at 20 years' imprisonment in the state penitentiary.

Motion for new trial was duly filed. On November 21, 1938, the court overruled said motion and rendered judgment in accordance with the verdict. To reverse the judgment an appeal was taken by filing in this court on May 20, 1939, a petition in error with case-made.

Of the several assignments of error only two are argued:

First, that the court erred in submitting to the jury the issue of manslaughter in the first degree;

Second, that the jury were allowed to separate while deliberating upon their verdict.

Upon the trial the defendant admitted the commission of the homicide, but claimed that the deceased was accidentally shot while they were engaged in a scuffle for possession of a pistol.

Counsel for appellant in their brief say:

"The defendant in this case, according to the evidence of the state, was either guilty of murder and should have been given the extreme penalty or life imprisonment in the penitentiary or acquitted upon his plea of accident, that the homicide was excusable."

The theory of the state is that the manner of this killing shows that it was a willful, deliberate and premeditated murder.

In order to better understand the questions presented, it will be necessary to give a brief statement of the facts

disclosed by the evidence, and also to quote excerpts from the testimony of certain witnesses for the state and on behalf of the defendant.

It appears that the homicide was committed between 10 and 11 o'clock on the morning of June 7, 1938; that the scene of the homicide was about two and one-half miles north of Cairo, Coal county.

O. C. McMillan, undersheriff, testified that he had known the defendant all his life, and arrested him June 7th in front of John Ward's house, about a mile from Cairo. His mother, Mrs. Welborn, had called him and said she wanted him to take charge of Howard; that he had shot a girl; that he asked Howard what he had done and he said he had shot a girl and gave him the gun. State's exhibit "A", a 38 Colt pistol, was introduced and identified as the gun he took from the defendant. It had been shot three times; that on their way to town he asked Howard how it happened and he said this girl tried to take the gun away from him and she was shot in the scuffle. That afternoon he went to the scene of the shooting; the Thompson house sets back west of the road, something like 190 steps; when he got to the mailbox the first thing he noticed was a spot of blood, three steps north of the mailbox, and he found about eleven steps down the path to the house where blood was and the grass was all mashed down, and he noticed right close to the mailbox that a horse had stood and tromped, and that the horse went north.

Dr. J. J. Hipes testified that he had practiced medicine at Coalgate for twelve years; was called on June 7th to the Mowdy settlement and went to the home of Mr. Thompson; there he found a dead woman. Upon examination he found a gunshot wound in the back of her head, about three-fourths of an inch below the crown, and another gun-

shot wound in the small of the back, which went through and came out about three-fourths of an inch left of the navel.

W. P. Powers testified that he was an undertaker and was called to the Thompson home, north of Cairo; there found the body of Mrs. Stella Thomas, and conducted the funeral; that he examined the body and found no powder burns on the body, or on her clothes.

Lola Brown testified she knew Howard Welborn; that around the hour of 10 that morning she saw him pass Jim Mowdy's house, going south; he was riding a brown horse, and stopped at the mailbox; she heard three shots, and then she saw Howard run and jump on the horse and lope off.

Bessie Thompson testified that she lived in the Mowdy schoolhouse settlement, and was in her home that morning, and Stella Thomas, her sister, was there with her when the defendant, Howard Welborn, came to the house and spoke to them. Stella was sewing. Howard went to the kitchen to get a drink, came back and asked Stella why she was not there Sunday. She said he was drinking. Stella looked at him and he looked at her. She said she would be back in a few minutes, and they went down towards the hog pen. Then Stella and Howard came back, going in the direction of the mailbox. Then she heard three shots, two right together. Then she went to the window, and heard Stella screaming. She ran down to the mailbox and found Stella lying there on her left side. She picked her up and saw that she was almost gone, and ran out to the road. When she got back Henry Baker was there, and then her brother and John Mowdy came, and they took Stella to the house; she was not quite dead, but died when laid on the bed.

John Mowdy testified that he lived a quarter of a mile south of the Thompson home; that morning about 10:30 he was down in the field planting corn, about 200 yards from the mailbox; when he heard the shooting he went to where Stella was, and then went home.

He further testified that he had a conversation with the defendant Sunday prior to Tuesday, June 7th, in the back-yard at Jim Mowdy's; the defendant asked him for a cigarette, and said that he was going to see his girl and take her to the singing; he came back in about 30 minutes, asked for another cigarette, and said he would not bother him any more that day; that he and his girl had fallen out, and he was through, and if there was any making up she would have to come to him; that he had been going with Stella for two years, and had given her a little money and a pig and had protected her all he could. The defendant was drinking that day.

For the defendant:

Mrs. Josie Welborn, the defendant's mother, testified that she lives 15 miles northeast of Coalgate, on the other side of the Mowdy schoolhouse; that she is a widow; that her husband was killed in Coal county about 20 years ago; at that time she was living where she lives now, managing her farm; has two married daughters living and two sons dead; that Howard lived most of the time with her, and on his place nearby; that he has been married and divorced; that she had known Stella Thomas all her life; that Stella visited her home there often, and often rode to town with them; that she knew Stella's husband, and advised Stella to go back to him, that it would be better for the baby, that it was not for the old folks to raise the child. Stella sometimes said she would, another time said she would not; that she had not seen anything in life and was going to see some of it. That she heard Howard tell Stella

on several occasions to go back to Ambrose, that he was a good kid. That on Saturday afternoon, before the shooting on Tuesday, Howard left the place on horseback and did not return until Sunday night between 8 and 9 o'clock. That on Sunday morning he told that he had pawned his gun, and she told him he ought to be ashamed. It was his dead brother Clyde's gun, that she had bought and given to Clyde, and she was keeping the gun there as a keepsake, because it belonged to Clyde; that she called Howard on Tuesday morning, and after he fed the horses he got on his horse and went west. The next time she saw him that day she was sitting on the porch and saw him coming in the side gate, running the horse. He said, "Mamma, get your things on, let's go to town, Stella is shot." She said, "My God, how did it happen?" He said, "She was trying to take my gun away from me and I would not let her have it." "He said it was an accident, and for me to get my things on and get a doctor. When we got to John Ward's place we stopped," and she called Olin McMillan and told him to take charge of Howard, and to take the gun. Howard gave him the gun and got in his car. That the gun introduced in evidence looks like her gun.

Several witnesses testified that they knew the defendant's reputation as a peaceable and law-abiding citizen in the community which he lived, and that reputation was good.

As a witness in his own behalf the defendant testified that he was married in 1923, and lived with his wife until 1926, when they were divorced; that he had known Stella Thomas all of her life; that he had often gone with Stella, and with her sister Bessie; that the two girls lived with their parents, Mr. and Mrs. Thompson, and Stella's child lived with them. That on Tuesday morning he went to Albert Keener's to get his gun that he had given to Mr.

Keener the Saturday night before; Mrs. Keener was in the garden and Mr. Keener and his father were fixing a fence; he asked Mrs. Keener if he could get his gun, that he wanted to get it and get back to work. She said, "Yes," and went in the house and brought out the gun, shells and scabbard. He loaded the gun and stuck it under his belt, got on his horse and rode to the Thompson home, tied his horse to the fence near the mailbox, and walked down to the house. Stella and Bessie and the little child were in the house; Bessie said she had bought a pig and wanted him to see it, and he walked out with Stella to the pigpen, then came back through the yard; Stella asked him if the postman had come; he said not at that time, and she said she would go with him that far, and they walked along the path going to the mailbox. Stella asked him for some money to leave with; he told her he did not have the money, that he would have to make a trip to town on Saturday, and she said, "The old man will be back before then and it would be too late." That she bumped into him and wanted to take the gun from him, and wanted him to leave the gun there for her to keep to protect herself. He told her that she did not need it, and pushed her back and started to go through the three-wire fence when she grabbed the gun, and was pulling and trying to get it loose; that at that time he weighed 110 pounds with a heavy pair of spurs on, and Stella weighed 132 pounds; that she got the gun out of his pants, and he had hold of the gun too; they went down, and as they fell the gun fired and fell by their side; he picked it up; it was jammed in the scabbard; he attempted to get it loose and it fired again. He could see that she was shot and was hurt and he got on his horse and rode home to get his mother's car; there he told his mother about the accident, and there was no time to lose to get a doctor there. They drove on until they met

Mr. McMillan and stopped; his mother told the officer as he has testified. He then came on with the officer and has been in jail since that time; that he did not kill Stella Thomas.

Counsel in their brief state:

"We are not unmindful of the fact that this court in a number of cases has stated and held where an instruction is given on manslaughter in the first degree, and the evidence show that the defendant was either guilty of murder or nothing; that it is harmless error of which the defendant, as plaintiff in error here, cannot complain. But, we think that this position is unsound and untenable and not justified by the best reasoning and the weight of authority."

In support of this contention counsel cite James v. State, 14 Okla. Cr. 204, 169 P. 1127; Leseney v. State, 13 Okla. Cr. 247, 163 P. 956, and cases cited in Taylor v. State, 44 Okla. Cr. 58, 278 P. 1117.

In the case of James v. State, supra, this court held:

"On a trial for murder where the evidence, however slight, would warrant the jury in returning a verdict for manslaughter in the first degree, it is the duty of the trial court to instruct the jury on the law of manslaughter in the first degree."

The Code of Criminal Procedure provides:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." Section 3097, 22 Okla. St. Ann. § 916.

By numerous decisions of this court the rule is well settled that, on a trial for murder, if the evidence demands a conviction of a higher degree of homicide, and does not warrant an acquittal, the defendant is not entitled to a new trial on the ground that, under the instructions so permitting, the jury found him guilty of a lower degree. Lytton v. State, 12 Okla. Cr. 204, 153 P. 620; Irby v. State, 18

Okla. Cr. 671, 197 P. 526; Harper v. State, 20 Okla. Cr. 43, 200 P. 879; Inman v. State, 22 Okla. Cr. 161, 210 P. 742; Calloway v. State, 38 Okla. Cr. 418, 262 P. 696; Seabolt v. State, 59 Okla. Cr. 1, 57 P. 2d 278.

In the case of Wilmoth v. State, 20 Okla. Cr. 453, 203 P. 1055, 21 A.L.R. 590, this court held:

"In a prosecution for murder when the court submits the issue, and the jury finds the defendant guilty of manslaughter in the first degree, in a case where the law and the facts make the crime murder, it is an error in the defendant's favor, of which he has no cause to complain."

In Taylor v. State, 44 Okla. Cr. 58, 278 P. 1117, this court held:

"In a prosecution for murder when the court submits the issue and the jury finds the defendant guilty of manslaughter in the first degree, although under the law and the facts the crime is murder, yet, if defendant is convicted of a lower degree of homicide than that shown by the evidence, no prejudice could have resulted to him, and this court will not reverse a conviction because of such error."

"Manslaughter in the first degree" is defined as follows:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor." Section 2223, O.S. 1931, 21 Okla. St. Ann. § 711.

The testimony of the defendant shows that he was carrying a pistol, in violation of the statutes making it a misdemeanor, when he fired the fatal shots. Sections 2589, 2590, 2592, 21 Okla. St. Ann. §§ 1277, 1278, 1280.

It is the province of the jury, if the defendant is found guilty, to determine and fix the degree by their verdict, and where the jury in a homicide case finds the defendant guilty of a lower degree, where the law and facts make it murder, it is an error in favor of the defendant of which he

cannot complain. Juries frequently render just such verdicts, and this can only be accounted for upon the theory that the verdict was the result of a compromise of opinion. Fisk v. State, 62 Okla. Cr. 305, 71 P. 2d 499.

As we view the evidence in this case, the homicide was a deliberate cold-blooded assassination. The previous preparation, and the physical facts, resist and absolutely repel the theory of accidental homicide. Upon his own testimony the defendant is guilty of manslaughter in the first degree.

The court's instructions are a model set, fully and correctly covering every phase of the law presented by the issues raised.

In support of the remaining assignment appellant contends that the court erred in overruling his motion for a new trial on the ground that the jury were allowed to separate while deliberating on their verdict.

As bearing on this ground the record shows that the only testimony taken was that of the bailiff, Earnest Tollis, who testified that after the submission of the case, the jury were taken to the jury room, on the fourth floor of the courthouse, by him; that during their deliberation three jurors at their request were taken to the toilet on the third floor, and the remaining jurors were left locked up in the jury room, that these jurors did not converse among themselves about the case nor did any person converse with or speak to them while coming from or going back to the jury room.

This court has had occasion many times to construe section 3081, Code of Criminal Procedure, 22 Okla. St. Ann. § 857.

This court has uniformly held that on proof of a violation of this section by permitting the jury to separate

after retiring for deliberation, the defendant is entitled to the presumption that such separation has been prejudicial, and the burden of proof is on the state to show that no injury could have resulted therefrom to the defendant. Wilcox v. State, 69 Okla. Cr. 1, 99 P. 2d 531.

In the case of Lemke v. State, 56 Okla. Cr. 1, 32 P. 2d 331, 334, a conviction of murder and sentence off death, it is said:

"The division of a jury by placing them in different sleeping quarters is not a separation. A mere temporary separation for a purpose as the use of a toilet or the use of a telephone or kindred reasons is not within the meaning of the law forbidding a separation of the jury. Elkins v. State, 29 Okla. Cr. 175, 233 P. 491; Forester v. State, 36 Okla. Cr. 111, 252 P. 861."

In 16 C. J. p. 1077, sec. 2530, it is said:

"While the separation of the jury is defined to be the departure of one or more jurors from their fellows, or all of the jurors departing from each other, not every withdrawal of a juror from the immediate presence of his fellows constitutes such a separation as will affect the verdict. The rule that the jury must be kept together does not apply, even in capital cases, to temporary separation of one or more jurors from the others in cases of necessity, where the separating jurors are in charge or in sight of an officer and are not allowed to communicate with other persons."

Obviously, this assignment is wholly without merit.

Our conclusion is that the defendant had a fair and impartial trial, with every right accorded to him that the law justifies or requires.

The judgment of the district court of Coal county herein must therefore be affirmed.

It is so ordered.

JONES, J., concurs. BAREFOOT, J., absent.