## HAMILTON v. STATE.

No. A-11504. April 2, 1952.

Rehearing Denied May 14, 1952.

(244 P. 2d 328.)

Champion, Champion & Wallace, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, J. R. Hamilton, was charged in the district court of Carter county with the crime of murder, was tried, convicted of manslaughter in the first degree, and pursuant to the verdict of the jury was sentenced to serve ten years imprisonment in the penitentiary, and has appealed.

The killing of Calvin Martin by the defendant was admitted. The defendant sought acquittal on the ground of temporary insanity as a result of months of brooding over the association between the deceased and the wife of defendant.

The state showed that about 9:30 p. m. the night of the homicide the defendant purchased a .38 caliber Smith and Wesson revolver for $45 at a store in Ardmore; that a few minutes later he accosted the deceased in front of his drugstore as he was removing some bottles from a pop box preparatory to closing the drug store for the evening. The defendant approached, called the deceased by name, and when he turned he emptied the revolver into his body. All six bullets took effect. A doctor who examined the deceased testified that at least three of them would have been fatal. After the shooting the defendant went to the police station and said,

"I have killed Calvin Martin. I didn't want to kill that man, a number of people may think it was a long time, I love my wife and children and I told Calvin over a year ago if he didn't leave my wife alone I was going to kill him".

The defendant showed by many witnesses that for over a year the deceased had been keeping company with his wife. Witnesses testified that they had seen them together in cafes, beer taverns, picture shows, on the beach at Lake Murray, and parked in automobiles.

The wife of defendant testified that she commenced working at Daube's Department Store in Ardmore in June, 1948; that on the first day she worked she and some of the girls working at the store with her went to Martin's Drug Store where the deceased worked; that she saw the deceased every day after that time but did not have a date with him for about two months; that the deceased took her home from a picture show one night and she did not arrive home until about 1:30. She identified a wrist watch, a book of love poems, some perfume, a bracelet, and other small articles, which she related the deceased had given to her. She testified that she and her husband had arguments over the attention which the deceased was paying her and that on two different occasions the defendant went to the deceased and asked him to quit associating with Mrs. Hamilton. On each of these two occasions Mrs. Hamilton related that she told the deceased that they should quit keeping company and the deceased agreed, but that in about two weeks after such occasion he would commence calling her and she would start keeping company with him again; that about a week before the homicide occurred she and the deceased were riding together on a highway just outside of the city of Ardmore and met the defendant returning in his truck; that when she returned home she and the defendant had an argument and she told the defendant she thought it was best for him to leave the home, that she did not love him any more. The defendant then stayed at night during the remainder of the week at the warehouse where he worked. The owner of the warehouse and other individuals testified to the defendant sleeping there at night.

On the afternoon before the homicide occurred at night, the defendant related that he went back to his home to talk to his wife to try to effect a reconciliation. During the conversation he asked his wife if she had done anything other than have dates with the deceased and she commenced to cry. Later that evening the defendant purchased the gun and fired the shots which took the life of Calvin Martin.

The defendant testified that he had learned from friends that Calvin Martin was paying attention to his wife; that he went to the Martin Drug Store and had a talk with the deceased and told him that defendant was married and had two lovely children, that he loved his wife and children and didn't want his home to be broken up, and the deceased promised to quit paying any attention to his wife; that several weeks later some of his friends told him that they had seen the deceased and Mrs. Hamilton together at Lake Murray, and also out on the highway; that on two occasions when he returned from his work he found the deceased parked in front of his house, and deceased left immediately when the defendant arrived; that he went to see the deceased a second time to talk to him about leaving his wife alone; that when he entered the drug store he said, "You promised to leave my wife alone and you haven't done that"; that deceased said he didn't have anything to talk about and asked defendant to leave the store. Defendant said during the few days before the homicide while he was staying at the warehouse at night he brooded constantly over his family affairs and became so mentally upset that he was unable to sleep or perform any of his work; that on the afternoon before the homicide, when his wife commenced to cry after he had asked her whether she had done anything other than have dates with the deceased, he felt sick; that he ate dinner with two of his friends and drank some beer; he then drove in front of his house and the lights were out; that he then became confused; the next thing he remembered was standing in front of the drug store and the deceased was lying there in front of him; the defendant had a gun in his hand; that he went to the chief of police and handed him the gun and the chief of police said, "The gun has been fired six times", and he answered, "Yes I guess I must have shot it six times". The defendant further testified that he had never been arrested before in his life; that he and his wife had been married nine years and that prior to her affair with the deceased that they had never had any marital trouble whatsoever; they had two small daughters, one aged eight and the other aged four.

Many witnesses testified on behalf of the defendant that the defendant's reputation for being an honest, peaceable and law-abiding citizen was good. These witnesses were not cross-examined and there was no effort to refute the prior good reputation of the defendant.

It is first contended that the court erred in submitting the issue of manslaughter in the first degree. Counsel for defendant contends that under the record the defendant was guilty of murder or should be acquitted on the ground of insanity. There is some merit to this assignment of error. However, we have come to the conclusion that under the law of Oklahoma the trial court acted properly in submitting the issue of manslaughter in the first degree. By statute it is provided:

"Homicide is manslaughter in the first degree in the following cases: * * *

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." 21 O. S. 1951 § 711.

Under the testimony of the defendant, he became quite upset when he learned a short time before the homicide that the deceased and his wife had been having improper relations. The jury might reasonably have concluded that after drinking the beer with his friends the defendant commenced to think about the relations between deceased and his wife and in the heat of passion inflicted the death wounds. Under such state of facts the defendant under the above statute would have been guilty of manslaughter in the first degree.

In Smith v. State, 83 Okla. Cr. 209, 175 P. 2d 348, 350, it was held:

"In a prosecution for murder, the court should submit the case for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and if the evidence tends to prove different degrees, the law of each degree should be submitted, whether it be requested by defendant or not."

In Welborn v. State, 70 Okla. Cr. 97, 105 P. 2d 187, this court stated:

"In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, whether it be requested on the part of the defendant or not, and it is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the first degree.

"In a prosecution for murder, where the court submits the issue, and the jury find the defendant guilty of manslaughter in the first degree, although under the law and the facts the crime is murder, yet, if the defendant is convicted of a lower degree of homicide than that established by the evidence, no prejudice could have resulted to him and this court will not reverse a conviction because of such error."

It is next contended that the court erred in admitting the testimony of Lora Twyford taken at the preliminary examination, because the record fails to disclose diligence used by the county attorney or proof that said witness was absent from the county or sick and unable to attend the trial.

With reference to this assignment of error, the record discloses the following:

"By Mr. Ritter, County Attorney: I would like to introduce State's Exhibit No. '3', this is a transcript of the preliminary hearing on September 13th, 1949, that is the testimony of the next witness as shown by said transcript, the next witness being Mrs. Lawrence Twyford. She was regularly subpoenaed and we are prepared to show that she is unable to attend at this time because of illness. We would like permission to read her testimony given at the preliminary hearing. By Mr. Champion, of Counsel for Defendant: I don't want to seem unduly contentious but that is not the proper way. By The Court: He would be entitled to use it if he properly caused subpoena to be issued and served on the witness and if that witness is not able to attend. By Mr. Ritter, County Attorney: I have been talking to her several times over the telephone, and she promised if she was physically able that she would be here today, she is not here today, she is suffering from a prolonged illness and if council wants five or ten witnesses here to show that, we can do so. By Mr. Champion, of Counsel for the Defendant: We object to that statement, counsel knows that is not the way to introduce the record, he could have had a certificate made out and had the certificate here instead of waiting on this thing. We only insist that he follow the regular rules of procedure. By Mr. Johnson, Sheriff: At the time I served the subpoena she was in bed at that time and she didn't think she would be able to be here. By Mr. Ritter, County Attorney: The reason we don't have a certificate here is because she stated to me there was a possibility of her being here, and she stated that she would make every effort to attend, and for that reason we do not have any doctor's certificate. By Mr. Wallace, of Counsel for Defendant: Counsel knew ahead of time that the witness might be sick, and he could have given notice and taken a deposition. By The Court: I will admit the testimony under that statement. By Mr. Wallace, of Counsel for Defendant: Show our exception."

It has been held by this court in many cases that where a witness has testified at the preliminary against an accused, and has been cross-examined, or the privilege of cross-examination offered, if at a subsequent trial involving the same issue it is satisfactorily made to appear that the witness has died, has become insane, or has permanently left the state, without collusion or procurement, or is sick and unable to attend, or his whereabouts cannot with due diligence

be obtained, a transcript of the testimony of such witness may be introduced as his evidence, and the use thereof will not be a violation of the constitutional right of the accused to be confronted with the witnesses against him. Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817; Burks v. State, 64 Okla. Cr. 285, 79 P. 2d 619.

Before the transcript of the evidence of a witness given at a former trial is admitted, there should be a showing that the witness cannot be produced, due to some one of the exceptions named. The admission of this class of evidence should be strictly observed since it is obvious that the privilege is subject to abuse and that the witness who is perfunctorily heard at the preliminary hearing might be purposely out of reach of the process of the court, where it might be of interest to the state to avoid further cross-examination by use of the transcript of their former testimony.

When the question as to the admissibility of testimony given at a preliminary examination or former trial is presented, the trial court is necessarily vested with a discretion in determining the sufficiency of the predicate that is laid for the purpose of introducing such evidence. In the instant case the witness Lora Twyford did not testify to any facts different from those shown by many other witnesses to the killing. Her testimony was cumulative. The defendant did not dispute any of the facts surrounding the killing which were detailed by this witness. Under such a state of the record, we hold that the admission of this evidence was not error.

The remainder of the assignments of error will be considered together. It is contended that the acts, conduct, and argument of the special prosecutor and the county attorney throughout the trial were prejudicial to the defendant's rights; that the acts and conduct of members of the immediate family of deceased during the trial in the courtroom and during the closing arguments were prejudicial to defendant's rights and prevented him from having a fair and impartial trial; and it is further contended that under the record the punishment was excessive. The record discloses that from the beginning of the trial to the close there were frequent exchanges between the special prosecutor and one or both of the counsel for the accused. These side remarks of counsel on both sides were wholly unprovoked and unnecessary. We have carefully read the record in connection with this assignment of error. We find that the special prosecutor and counsel for the defendant are equally to blame for the many interruptions and side remarks that were made during the course of the trial. However none of them were directed at the defendant or were remarks which tend to discredit the defendant. The remarks semed to be directed at counsel on the opposing side.

Typical of the exchange between counsel is the following:

"By Mr. Champion, of counsel for defendant: I asked her what was said and they objected, they have continuously objected all day long. By Mr. Champion, of counsel for the State: That is not fair, he knows I have not. By Mr. Champion, of counsel for defendant: I will contest him on that, they have objected all day long. By Mr. Champion, of counsel for the State: You have led the witness all day."

These voluntary remarks of counsel are to be deplored. However, we are unable to find any justification for our concluding that any of the remarks which were made reacted prejudicially to the accused. The jury evidently understood from the things that were said and done by the trial judge that the side remarks were no part of the trial proper.

In connection with the argument of the county attorney it is alleged that during his closing argument he made the remark to the jury that the burden of

proof on the question of insanity rested on the defendant. This question first arose at the hearing in connection with a motion for new trial. The record is in such shape that we are unable to determine just what did occur, but from the statement of the court it would appear that the county attorney did make a similar remark to the jury but 'that defendant's counsel objected at the time and the county attorney properly corrected his statement. The jury were correctly instructed on this issue.

It is further claimed that during the closing arguments three members of the immediate family of deceased, including his wife, his brother, and father, were seated right next to the jury rail and that the brother was actually seated within a foot or two of the jury inside of the rail. At the time this question was presented at the hearing on the motion for new trial the trial court stated:

"By The Court: Let me make a few comments, beginning with what he says concerning the proximity of interested parties to the jury box. I will say that in that regard that that standing alone, will be completely insufficient. I am not sure that any of the jurors, much less all of them, were able to recognize these parties, they may or may not, but there was no attempt, so far as I know, on the part of, we will say interested parties, meaning Mr. Edgar Martin and the widow of the deceased to sway that jury in any way. If so, it escaped my observation and I was rather observant. * * * Now then as to the point number one, the alleged prejudice of the Special Prosecutor. We will say this case was very vigorously tried, most of the actions of the five gentlemen actively participating was highly commendable, it did have a little more than usual from time to time, but I find myself thinking that the verdict itself indicates that this jury acted entirely without bias or prejudice, or without having paid too much attention as to what was offered on occasions within the way of excess verbosity, * * *."

Although we do not believe that the acts of the special prosecutor in constantly making side remarks during the course of the trial, or the alleged improper argument of the county attorney, or the alleged misconduct of members of the immediate family of the deceased, were sufficiently prejudicial to constitute reversible error, we shall take all of them into consideration in determining whether the punishment assessed by the jury was excessive.

We are strongly impressed with the fact that the defendant had had sufficient provocation from the deceased to cause him great mental disturbance. The proof from both the state and defendant's witnesses showed that the defendant on at least two occasions admonished the deceased to refrain from paying further attentions to the wife of the defendant. All of the evidence showed that the defendant was a quiet, peaceable man, with great love for his wife and children. For many weeks he endured the torture of knowing that his wife and the deceased were associating together, which knowledge of the association came to a climax on the afternoon of the killing when his wife admitted for the first time that the affair she had with the deceased consisted of more than a few harmless dates or flirtations, but had actually reached the point to where they were having illicit relations. Even a strong man with great self-control might have become mentally unbalanced at this revelation. The defendant's employers, his business associates, and other friends, all testified to the fact that he had become restless and was neglecting his business. On one occasion he was so disturbed that he neglected to close the doors of the warehouse where he worked when he left at night and the employer found them open. Two doctors testified for the defendant, from hypothetical questions that were asked based on their education and experience, that the defendant had sufficient provocation and from the actions which he committed apparently temporarily lost control of his mental processes so that he could not distinguish right from wrong. The deceased was not altogether at fault in the affair which he was having with

the wife of defendant. From the testimony of the wife it is apparent that she enjoyed the attentions which were paid to her and was perfectly willing to meet him at the various places which he suggested. But she was the wife of the accused. Until the deceased appeared on the scene the married life of the parties had been a very happy one.

The unwritten law, as it is so called, which authorizes a man to take the law into his own hands and take the life of a person allegedly having illicit relations with his wife, does not exist in Oklahoma, but we can perceive where a man of good moral character such as that possessed by the defendant, highly respected in his community, having regard for his duties as a husband and the virtue of women, upon learning of the immorality of his wife, might be shocked, or such knowledge might prey upon his mind and cause temporary insanity. In fact it would appear that such would be the most likely consequence of obtaining such information.

While we do not want this opinion to be construed as placing the stamp of approval on individuals taking the law in their own hands, we are deeply impressed with the fact that under the conditions which existed the accused had ample ground to become mentally unbalanced.

Under such a state of the record, and giving the contentions of counsel for the accused that he was denied a fair and impartial trial the fullest consideration to which they are entitled, we have come to the conclusion that the judgment and sentence of ten years imprisonment in the state penitentiary is excessive and should be modified to a term of four years imprisonment in the state penitentiary.

It is therefore ordered that the judgment and sentence of the district court of Carter county is modified from a term of ten years imprisonment in the state penitentiary to a term of four years imprisonment in the state penitentiary, and the judgment and sentence as thus modified is affirmed.

BRETT, P. J., and POWELL, J., concur.