**Joe Nathan THOMAS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–773.**

Court of Criminal Appeals of Oklahoma.

June 16, 1975.

Don Anderson, Public Defender, Oklahoma County, Joe Nathan Thomas, pro se, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., David O'Brien, Legal Intern, for appellee.

OPINION

BLISS, Judge:

Appellant, Joe Nathan Thomas, hereinafter referred to as defendant, was charged in the District Court, Oklahoma County, Case No. CRF–72–1562, for the offense of Murder, in violation of 21 O.S. 1971, § 701, and was thereafter tried and convicted of the crime of Manslaughter, First Degree in violation of 21 O.S.1971, §

711. His punishment was fixed by jury at a term of fifty (50) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness at trial was Bill F. Snipes. He testified that he was employed as a Detective for the Oklahoma City Police Department, Homicide Unit, and was so employed on July 2, 1972. He further stated that on that day he was assigned to make a followup investigation of the death of McKinley Brown. He stated that at about 12:30 a. m. on July 2, 1972, he went to Brown's Cafe at 430 N.E. 6th Street "in reference to a man being shot." Upon arrival at the cafe he found a man lying on the sidewalk with what appeared to be an entrance wound on the right side of his back. His subsequent investigation revealed that the deceased man was the proprietor-owner of Brown's Cafe. He stated that during his investigation he received the name of Joe Gallo as the man who committed the crime and that later a car was located which belonged to Joe Gallo; but, upon checking the registration, it was determined that a Joe Nathan Thomas had registered the car. He later obtained a picture of Joe Nathan Thomas and upon showing it to witnesses they positively identified this picture as being a picture of the man who shot Brown. He lastly testified the charges were filed against Joe Nathan Thomas and that subsequently Mr. Thomas was arrested in Houston, Texas.

Donald Dillard testified he was employed by the Oklahoma City Police Department and was so employed on July 2, 1972. He further testified that on that day, in response to a call, he proceeded to 430 N.E. 6th Street where upon his arrival at that location he observed the deceased lying face down. Nearby lay a .38 caliber pistol. He stated that he remembered Detective Snipes making a followup investigation of the incident.

Oline Daniels testified that on July 2, 1972, he had occasion to be in Brown's Cafe at 430 N.E. 6th Street, Oklahoma City, Oklahoma. He testified to the following events which occurred at Brown's Cafe on the evening of July 2, 1972. The defendant, after having drunk some beer, proceeded to leave the cafe and the proprietor, McKinley Brown, asked the defendant if he was going to pay his beer tab. Defendant questioned whether he owed anything and subsequently left but returned shortly thereafter with another man. Someone in the cafe had paid the defendant's bill prior to the defendant's return, and upon the defendant's arrival Brown told the defendant that he didn't want him in the place, to which defendant replied, "you can't make me get out." Brown turned facing the cash drawer with his back towards the defendant and thereupon the defendant fired a gun. The defendant then ran out the door and Brown raised up with a gun, staggered to the door, and went outside where five shots were fired. The witness went outside and saw Brown lying face down on the sidewalk with a pistol at his feet.

Charles E. Marshall testified that he was a Medical Doctor and was employed as a consultant to the Chief Medical Examiner's Office, and that he was so employed on July 2, 1972. He further stated that on that evening he was called to the scene of the death of the deceased who had been identified to him as McKinley Brown. At the scene, which was the sidewalk in front of a bar on N.E. 6th Street, he performed a preliminary examination and pronounced McKinley Brown dead. He conducted an autopsy later on Brown and in his opinion death was caused by a gunshot wound which resulted in internal hemorrhage with the bullet entering the back two and one half inches to the right of the eighth thoracic vertebra.

Ernest Hamilton testified that he was playing dominos in Brown's Cafe on July 2, 1972, at which time he overheard the conversation between Brown and the defendant concerning payment for some beer. He stated that the defendant left and thereafter one Collus Bond paid the de-

fendant's beer tab. Upon the defendant's return, Brown said he did not want the defendant in his place. At this time Hamilton said he saw the defendant with a pistol in his hand. He further testified that at this time he saw the defendant point this pistol at Brown and that as Brown turned to reach under the cash drawer a shot was fired. He said that Brown fell on one knee and the defendant went out the door subsequently followed by Brown who had a pistol in his hand. As Brown passed him headed toward the door, he noticed a red spot of blood on Brown's back. Hamilton followed Brown outside where he saw Brown firing his pistol toward the ground, and thereafter Brown fell against the building and then fell face down on the sidewalk. He lastly testified that Brown laid there for approximately 15 to 20 minutes before medical help arrived.

N. L. Barber testified that he was employed as an Identification Officer for the Oklahoma City Police Department, and was so employed on the evening of July 2, 1972, at which time he was involved in the case of McKinley Brown. After being shown State's Exhibit No. 2, he identified the exhibit as a picture he had taken of McKinley Brown at the scene of the shooting at 430 N.E. 6th Street in front of the bar.

Wanda Jean Thomas was the first witness called for the defense. She testified that she was the defendant's wife and was with him at the cafe on July 2, 1972. She stated that a difference arose between Brown and the defendant concerning whether or not the defendant had gotten some more beer and not paid for it. She stated that subsequently Collus paid what Brown said the defendant owed and when the defendant tendered the money to Brown it was refused. Thereafter Brown called defendant a "bad nigger." Then Brown told the defendant to leave the bar. She testified that thereafter the defendant produced a gun in his hand and Brown went to the counter at which time she heard a shot. The defendant then ran out followed shortly by Brown, whereafter she heard five more shots. She stated she was across the street looking when she heard the five other shots because the defendant had told her to get out of the bar. She did not see the defendant any more that night but about a week later she received a telephone call from the defendant who said he was in Houston and that he had traveled there by hopping a freight train. He told her that a bullet had glanced off his head on the night of the shooting.

The defendant took the stand to testify in his own behalf. He testified that he and his wife were at the cafe that night and that a dispute arose between himself and Brown over what defendant owed for beer, but the defendant insisted he had paid in full. He stated that he then left to get a friend who would verify his claim and upon his return the dispute resumed. The defendant then testified to the following sequence of events:

"[M]y wife say come on Joe, and I walked on toward the door. About the time I took about two steps Mr. Brown say yeah, you get him out of here before I blow his god damn ass out of here. I say no, Mr. Brown, ain't nobody going to throw me nowhere. You understand that, because I ain't going to let nobody throw me nowhere. So when I said that Mr. Brown was standing in this area here. He broke in a fast—it wasn't a run, it was a fast walk. Well, I told my wife then, I said, Jean get on out the door. I reached and got the door while she was running to this point. I opened the door and when I turned around, open the door with my right hand and pushed my wife around to the front, Mr. Brown had made it over to this area and was stooping down under the counter and he was coming up. When I seen the gun— I had already pulled my gun when he took off running down through there and I told Jean to get out the door, I had already pulled my gun and had it down to the side of my leg like that and when I opened the door and was telling Jean get out the door he was raising up. He was coming up with the gun. His

back was still toward me, but he had the gun in his hand. I fired. I don't know, I just froze and I fired and the man dropped. He turned facing me with the gun in his hand and the last thing I remember I was in the door and I seen him do like this, in this motion (indicating). That's all I know. And I found myself outside the door laying not on the driveway—I mean not on the sidewalk, in the driveway, blood running from the side of my head." (Tr. 208–209)

He further testified that part of his thumb had been shot off and a bullet had creased his scalp. Thereafter he hopped a freight train to Texas and was arrested in Houston October 15, 1973. He further testified of an incident in which Brown had become angered at a customer and shot at him with a pistol, and three other incidents in which Brown had threatened another with a pistol.

In rebuttal Detective Storemski testified that he was employed by the Houston Police Department and that after giving the Miranda Warning to the defendant he obtained a statement from the defendant in Houston. He testified that the defendant told him that he shot Brown because he figured Brown was reaching for a pistol.

The defendant's first proposition contends that the trial court committed reversible error by giving an instruction for manslaughter over the defendant's objection. The evidence adduced at the trial revealed that there was a heated argument between the deceased and the defendant. The defendant had been ordered from the bar by the deceased and had refused to leave. He testified that he felt some degree of fear and apprehension in that he had pushed his wife outside only seconds before the shooting started. The defendant knew of the deceased's reputation for having previously threatened and shot at customers. The defendant was carrying a pistol and testified that the deceased was in the process of reaching for a gun behind the bar when he was shot. We have

stated in Wood v. State, Okl.Cr., 486 P.2d 750 (1971):

"It is the general rule that passion resulting from fight or terror may be sufficient to reduce a homicide from murder to manslaughter and such a killing may be closely akin to a killing in self-defense. Kinard v. United States, 68 App.D.C. 250, 96 F.2d 522. A homicide may be reduced from murder to manslaughter where the killing was done because the slayer believed that he was in great danger, even if he was not warranted in such belief or where the slayer although acting in self-defense was not himself free from blame. Freeman v. State, 174 Ark. 1035, 298 S.W. 333; 40 C.J.S. Homicide § 42."

Furthermore, we held in Tarter v. State, Okl.Cr., 359 P.2d 596 (1961), that:

"In fact, we have gone so far as to hold in such situations the trial courts should give the defendant the benefit of any doubt which the evidence may suggest, and instruct the jury on the law of each degree which the evidence tends to prove, whether requested or not it is the trial court's duty so to do. Smith v. State, 59 Okl.Cr. 111, 56 P.2d 923; Smith v. State, 83 Okl.Cr. 209, 175 P.2d 348; Tucker v. State, 66 Okl.Cr. 335, 92 P.2d 595, holding that if there is any evidence that would reduce the crime from murder to manslaughter the trial court should instruct on manslaughter in the first degree."

In Williams v. State, Okl.Cr., 513 P.2d 335 (1973), we held that:

". . . if there is any evidence that would reduce the crime from murder to manslaughter the trial court should instruct upon manslaughter in the first degree. Welborn v. State, 70 Okl.Cr. 97, 105 P.2d 187; and Tucker v. State, 66 Okl.Cr. 335, 92 P.2d 595."

■ Consequently, we find that the evidence adduced at trial made it not only proper but also necessary that an instruction for manslaughter in the first degree

be given. Furthermore, the actions of the trial judge in this case are consistent with our recent opinion of Morgan v. State, Okl.Cr., 536 P.2d 952 (1975), where this Court stated:

"We, therefore, further hold, that in every future prosecution for murder, wherein evidence necessitates an instruction upon self-defense, the trial court shall also instruct upon voluntary or first degree manslaughter committed in the heat of passion as a lesser included offense."

Therefore we find the defendant's first proposition of error to be without merit.

Defendant's second proposition of error is that the prosecution failed to prove venue and jurisdiction of this crime. We refer to the testimony of Police Officer Donald Dillard (Tr. 21–22) wherein he stated that the crime occurred in Oklahoma City, Oklahoma County, Oklahoma. This allegation is frivolous and without merit.

The defendant further alleges that error was committed through the prejudicial testimony of Police Officer Bill Snipes. A review of the record reveals that defense counsel's objections to prejudicial testimony were sustained. Further, other statements made by Officer Snipes were not objected to and this Court has consistently held that failure to object to the same constitutes waiver thereof.

Defendant's final proposition that he was denied a fair and impartial trial due to the fact that the jury was sequestered in a hotel in an "unsafe part of town" is not supported by evidence. This Court's review of the record fails to reveal any such prejudice to the defendant, and we find this proposition to be without merit and not worthy of consideration.

Therefore, having considered the defendant's appeal, we conclude that he received a fair trial in accordance with the due process of law and that the conviction herein should be affirmed.

BRETT, P. J., and BUSSEY, J., concur.