Calvin **BARNETT**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–75–377.

Court of Criminal Appeals of Oklahoma.

Feb. 18, 1977.

Alvin L. Floyd and Steven J. Berg, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Calvin Barnett, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–74–187, for the offense of First Degree Murder, in violation of 21 O.S.Supp.1974, § 701.1, ¶ 2. In accordance with the provisions of 21 O.S.Supp. 1974, § 701.3, the defendant was thereafter sentenced to suffer death, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Officer Sam Cox, a Tulsa Police Officer, who testified that at 9:24 a. m. on the 18th day of January, 1974, he received a call to go to an area near Pine and St. Louis Streets in the City of Tulsa, Tulsa County, Oklahoma. When he arrived at that location he was directed to a point approximately 300 feet east of the intersection of Pine Place and St. Louis Place where he found a white 1965 Chevrolet, partially backed off of Pine Place. In the front seat of the Chevrolet there was a Negro male, in his early to middle fifties, dressed in a white T-shirt, a brown coat and dark slacks, who appeared to be dead. Officer Cox testified that State's Exhibits Nos. 1 through 20 were photographs of the scene that he had just described, and that the photographs accurately and correctly depicted the scene as he remembered it being on January 18, 1974.

Officer Cox further testified that on January 21, 1974, he and several other officers of the Tulsa Police Department arrested the defendant at 1619 East Ute Street in the City of Tulsa; that he booked the defendant in at the Tulsa Police Station, and that two billfolds, one black and one brown, were removed from separate pockets of the defendant, along with other items. The witness identified State Exhibit No. 21, as the black billfold he had removed from separate pockets of the defendant at the booking. The witness then made a courtroom identification of the defendant as the person he had arrested.

The State then called Officer Paulette Kracht, a police officer for the City of Tulsa, who testified that she arrived at the scene after Officer Sam Cox; her testimony concerning the scene was essentially the same as that of Officer Cox. She further stated that there was much blood on the inside of the vehicle and on the person who was lying on the front seat of the automobile.

The State then called Dr. Leo Lowbeer, Chief Pathologist at Hillcrest Medical Center, to the stand. He testified that on January 19, 1974, at 9:00 a. m., he performed an autopsy on one Leroy Augustus

Brewer and determined the cause of death was the perforation of the aorta by a knife or knife-like object, and that the deceased had an alcoholic level in the blood of .348 grams percent. On cross-examination, Dr. Lowbeer stated that there were ten stab wounds on the body, two on the fingers, one in the upper abdomen, and one beneath the left collar bone, and the remainder around the neck area of the body.

The State then called Officer Jess McCullough of the Homicide Detail, Tulsa Police Department, to the stand. Officer McCullough testified to essentially the same facts concerning the scene as did Officers Cox and Kracht. Additionally, Officer McCullough testified that the car at the scene, containing the body, checked to one Leroy Augustus Brewer. He stated that on January 21, 1974, he recovered a hunting knife, black tape-bound and scabbard from Brenda Atkinson, which he observed her remove from a closet in her apartment at 1619 East Ute in the City of Tulsa. He identified State Exhibit No. 25, as that knife.

The State read the testimony of Barbara Hill from the transcript of the preliminary hearing, after first showing that she was not available for the trial. Her testimony was that on January 17, 1974, she resided at 1619 East Ute and that some time around midnight on that night, the defendant came by her house to visit; that the defendant had in his possession "a long knife and it had a black handle wrapped in tape with a little black case." She further testified that she saw the defendant with a black billfold, and that she believed that this was on Friday [January 22, 1974]. On cross-examination, she stated that the defendant was looking at the wallet; that she went upstairs in the apartment; that when she came back down the defendant was in the kitchen and had been burning some papers in the sink.

Brenda Atkinson then took the stand and made a courtroom identification of the defendant. She stated that on the 17th of January, 1974, she was residing with her cousin Barbara Hill, and that shortly after midnight, Thursday, going into Friday morning, the defendant appeared at her apartment and knocked on the door. After entering, the defendant requested that if anyone asked, to say that he had been at her apartment all night. The defendant produced a wet knife which she identified as State Exhibit No. 25, and requested that she put it up for him. She put the knife in her closet on the top shelf. She further testified that some time thereafter she saw the police coming and she hid the knife in the furnace closet door. She informed the police that the defendant was not there. When the defendant came in through the back door she told him that the police had been there. The defendant left through the front door, and officers arrested him. Later, when detectives questioned Brenda about the knife, she initially lied, but finally showed them where she had hidden the knife.

Wilburn Phillips, defendant's cousin, testified that on January 17, 1974, the defendant wanted to go to his girlfriend's house on Greenwood, but Wilburn did not have enough gas. However, he agreed to take him as far as Pine and Peoria Streets where he let the defendant out of his car between 8:00 and 9:00 p. m. at the D X Station located there. Late that night, the defendant came to Phillips' home and rang his doorbell incessantly. The defendant was out of breath and was wearing a green army coat. He had blood all over his hands and possessed a bloody knife which was wrapped in black tape, which he identified as State Exhibit No. 25.

The defendant advised his cousin to tell anyone who might be looking for him that he had been there at his cousin's house. Upon asking what had happened, the defendant advised that some young punks had tried to get smart with him and that he stabbed them. The defendant went upstairs to wash his hands and the knife. Shortly thereafter, the defendant left for Brenda's house, which was close-by. The next day the defendant came back to his cousin's house where he cut out a newspaper article relating to Leroy Brewer, which stated that the victim had been stabbed

four times. The defendant told his cousin that the article was "a damn lie," that he was stabbed two times.

On Sunday, that same weekend, while the defendant was in the home and presence of his cousin and his cousin's wife (Rhonda Phillips), the defendant produced the billfold identified as State Exhibit No. 21, and a D X credit card bearing the name of the homicide victim. The defendant threatened to cut their throats if they said anything about it. Wilburn stated that on one of the occasions when he was with the defendant during the weekend, he asked the defendant, ". . . what have you did and why did you do it for, and he just said something come over him." [Tr. 303]

Subsequently, Wilburn Phillips called the police. Wilburn's wife, Rhonda, corroborated portions of her husband's testimony.

Cordelia Brewer testified that she was the wife of the victim, Leroy Brewer; that he carried a D X credit card and traded at the D X Station on Pine and Peoria. She stated that State Exhibit No. 21 was a billfold just like the one she had given to her husband just after Christmas, and that he had the billfold with him when he left the house on the 17th.

Testifying in his own behalf, the defendant stated that his cousin did not take him to Pine and Peoria Streets on the date of the murder, but that the trip had occurred on the previous Tuesday. He stated that he occasionally spent the night with Brenda and Barbara at their apartment and on other occasions had visited with them for several hours, playing dominoes. He testified that Wilburn Phillips was a pimp and that Barbara was a prostitute.

Essentially, the defendant's account was that the victim had appeared at the apartment and obtained the services of Barbara. When the victim did not pay, he was confronted by Wilburn. Although the victim offered to go home and return with the money, Wilburn insisted that he and Barbara accompany him in his car. Wilburn wanted the defendant to accompany them, but he declined. Wilburn then gave the defendant the keys to his car and requested that he follow him. The defendant testified that he followed them to St. Louis and Pine Place where Barbara stopped the car and Wilburn exited from the driver's side from the back seat. When Barbara jumped out the defendant backed up Wilburn's car and returned to the apartment. The stated reason that he did not go to the car and pick them up was because he knew something was going on and did not want to have a part in it. Later, Barbara came in alone and gave him a black billfold, which was empty. He had no conversation with her concerning the billfold, but accepted it because he had left his billfold in another guy's car.

He admitted the knife in question was his, but denied that he had robbed or killed the victim, stating that he had left the knife in Brenda's apartment. He denied having Brewer's credit card; denied that he had blood on his person; denied commenting on the newspaper article concerning the killing; and denied burning papers in the sink.

On cross-examination, he stated that Barbara was driving, Mr. Brewer was in the middle and Wilburn was on the passenger's side in the front seat, which was contradictory to his earlier testimony that Wilburn was in the back seat.

He further testified that he did not talk to Barbara, Brenda or Wilburn about the incident when they returned to the apartment. He stated that the testimony of Wilburn Phillips, Rhonda Phillips, Brenda Atkinson and Barbara Hill was not true. He further stated that Wilburn and Barbara lied to protect themselves and that Rhonda lied to protect her husband. He did not know why Brenda would lie. He denied having his own brown billfold on his person when arrested and stated that the officer had lied about his possession of it when he was arrested.

The defense then called Roy Bradford, Records Clerk of the county jail, who testified his records reflected that the defendant released two keys with a case. Both sides then rested.

It should first be noted that the defendant made several assignments of error in his amended Petition in Error; however, only one assignment of error was perfected to this Court by brief.

■ For his assignment of error the defendant contends that the trial court committed prejudicial error in not instructing the jury on the lesser included offense of First Degree Manslaughter. A review of the record indicates that the trial counsel in this case did not request the court to instruct the jury on the lesser included offense of First Degree Manslaughter. It is defendant's contention that absence of such a request is immaterial; that the trial court has the duty to instruct the jury on the law of each degree of homicide which the evidence tends to prove. With this contention we agree. This Court has held many times that:

"In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, *whether it be requested on the part of the defendant or not*, and it is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the first degree. . . ." [Emphasis added]

*Welborn v. State,* 70 Okl.Cr. 97, 105 P.2d 187 (1940) and *Tarter v. State,* Okl.Cr., 359 P.2d 596, 605 (1961). See, also, *Provo v. State,* Okl.Cr., 549 P.2d 354 (1976). However, each of the above cited cases can be distinguished from the instant case on the facts. In *Welborn,* the trial court instructed on First Degree Manslaughter. The defendant therein was found guilty of First Degree Manslaughter and sentenced to twenty years. It was the contention of the defendant, Welborn, that he either committed Murder in the First Degree or Accidental Homicide; therefore, the court committed error in instructing the jury on Manslaughter in the First Degree. This Court, however, disagreed, stating:

"As we view the evidence in this case, the homicide was a deliberate cold-blooded assassination. The previous preparation, and the physical facts, resist and absolutely repel the theory of accidental homicide. Upon his own testimony the defendant is guilty of manslaughter in the first degree."

In *Tarter,* the State's case contained facts that if believed by a jury would justify a verdict of Manslaughter in the First Degree; specifically, the Sheriff testified that when he was transporting the defendant to jail, and before news of the victim's death came over the car radio, the Sheriff asked Tarter if he knew Robbie might die and Tarter replied, "No, I didn't intend to kill him, I just shot him in the legs," and repeated, "I wanted him to suffer as I have suffered." Then when the news came over the radio that Robbie was dead, the defendant said, "Oh, my God," and began to cry. The defendant then put on evidence to establish the defense of insanity, but did not take the stand in his own behalf.

Considering the above statement of the defendant, this Court held that under the State's own case, an instruction on First Degree Manslaughter should have been given.

In the recent case of *Provo,* the defendant executed a notarized statement wherein he admitted concealing a wooden club upon his person and going to Kasner's Jewelry Store in Oklahoma City with the intent to commit robbery wherein he stated, "Well, my intentions were to rob Mr. Kasner and knock him out and take what jewels and things I could, but not really hurt him. He put up a pretty hard fight. I hope he lives." This Court stated that the remark quoted immediately above, thus, introduced evidence specifically refuting a premeditated design to effect death, a necessary element to all categories of First Degree Murder as defined in 21 O.S.Supp.1974, § 701.1, and went on to hold that in accordance with *Tarter,* failure of the trial court to instruct upon First Degree Manslaughter was fundamental error and reversed.

Other cases cited by the defendant stand for the proposition that the trial judge must instruct on lesser included offenses, wheth-

er requested or not, unless the evidence is so conclusive as to disallow a reasonable jury from finding the existence of the lesser crime. *Gilbreath v. State,* Okl.Cr., 555 P.2d 69 (1976); *Thoreson v. State,* 69 Okl.Cr. 128, 100 P.2d 896 (1940); *Inklebarger v. State,* 8 Okl.Cr. 316, 127 P. 707 (1912); *Kilpatrick v. State,* 71 Okl.Cr. 129, 109 P.2d 516 (1941); *Palmer v. State,* Okl. Cr., 327 P.2d 722 (1958). Since this contention is merely a restatement of the law discussed above in *Welborn, Tarter,* and *Provo,* and since we have already stated our agreement with such contention, it will not be necessary here to go into a lengthy discussion of each case cited by the defendant.

We now turn to a discussion of whether or not the evidence of the case at bar was so conclusive as to disallow a reasonable jury from finding the existence of the lesser crime; or, more specifically, whether or not the evidence of the case at bar tends to prove any degree of homicide other than Murder in the First Degree. In the defendant's brief he sets out two conclusions that he contends the jury could have found from the facts presented to them in the case at bar. First:

> "The defendant did not stab Leroy Brewer but did go along with Barbara Hill and Wilburn Phillips on the 'collection trip' but left before an attempt to kill him was formed."

With this we agree. If the jury had believed the defendant's version then they should have found him not guilty. At page 359 of the trial transcript the defendant's attorney questioned him on direct examination as follows:

"Q. All right, did you kill Mr. Brewer?

"A. No, sir.

"Q. Did you rob him?

"A. No, sir.

"Q. Did you meet him at the Pine and Peoria D X Station?

"A. No. sir.

"Q. Did you jump in the car with him and take him out to that location or force him to drive out there, and stab him for his money?

"A. No, sir, I did not."

Moreover, the defendant's version of what happened is that he was in a separate car following the one in which the homicide victim was riding. When he observed something going on in that car, he returned to the apartment. Thus, if believed, the defendant's testimony could lead the jury only to the conclusion that he did not participate in the robbery or murder, and in fact, committed no crime at all.

The second conclusion that the defendant states the jury could have reached from the evidence in the case at bar is that:

> "The defendant did, in fact, kill Mr. Brewer but that it was not premeditated thereby lacking essential element of First Degree Murder."

The defendant states that this conclusion is supported by the testimony of Wilburn Phillips who stated, at page 303 of the transcript:

> "I asked him (defendant) what have you did and why did he do it for, and he just said something come over him."

This Court stated in *Newby v. State,* 17 Okl.Cr. 291, 188 P. 124, 128 (1920):

> "As heretofore repeatedly held, we deem the law to be that, if there is even slight evidence which tends to reduce the degree of the homicide from murder to manslaughter in either of its degrees, the trial court should give the defendant the benefit of any doubt which the evidence may suggest, and instruct upon such lower degrees. *However, the court is not required to delve into the realms of conjecture or speculation in order to instruct upon some theory of the case not reasonably supported by the evidence."* [Emphasis added]

We feel that the above quoted statement made by the defendant to Wilburn Phillips within the context of the evidence of this case, does not give rise to an instruction on Manslaughter in the First Degree.

Unlike the situation in *Provo,* the defendant in the instant case elected to take the stand. His testimony, if believed, would tend to show that Wilburn Phillips and Barbara Hill committed the robbery and mur-

der. Although he admitted receiving a billfold which was later identified as that taken from the victim, he steadfastly denied at trial that he participated in the robbery or murder in any manner.

In *Sanders v. State,* Okl.Cr., 556 P.2d 611 (1976), this Court stated the rule enunciated in *Newby v. State,* supra:

"' "When a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one." ' "

We therefore find that if the jury believed the State's case, which they did, that the only verdict they could return is one of guilty of Murder in the First Degree under the law existing at that time; on the other hand, if the jury had believed the statement of the defendant, which they did not, the only verdict they could have returned is one of not guilty. Accordingly, we hold that the trial court did not abuse its discretion. by not submitting an instruction on Manslaughter in the First Degree.

■ For all the reasons set forth above, and from a consideration of the record as a whole, we find that there was no substantial error and that the defendant received a fair and impartial trial. However, in accordance with *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), the sentence of the defendant is *MODIFIED* to life imprisonment, and as so Modified, the judgment and sentence is *AFFIRMED.*

BLISS and BRETT, JJ., concur.