# KOBYLUK v. STATE.

No. A-11298. April 25, 1951.

(231 P. 2d 388.)

Carmon C. Harris and Rollie D. Thedford, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty Gen., for defendant in error.

JONES, J. The defendant, Paul Kobyluk, was charged by an information filed in the district court of Oklahoma county with the crime of assault with intent to kill, allegedly committed on September 15, 1948, by shooting his wife, Palogia Kobyluk, with a twelve gauge double barrel shotgun; was tried, convicted, and given the maximum sentence of ten years in the penitentiary, and has appealed.

The defendant entered a plea of not guilty by reason of insanity at the time of the commission of the offense. The evidence of the state showed that commencing in 1945 the defendant commenced a course of conduct consisting chiefly of quarreling and abusive conduct toward his wife, and that on one or two occasions he struck her; that in August, 1948, Mrs. Kobyluk went to Claremore, Oklahoma, to take mineral baths for an arthritic condition from which she was suffering. Upon her return the defendant accused her of being off with another man and abused and threatened her constantly; that shortly after dark on September 15, 1948, Mrs. Kobyluk was seated at a breakfast table in the kitchen of her home crocheting. The defendant came to the kitchen window and fired a shotgun blast through the window, striking Mrs. Kobyluk in the breast, arms and

face. She screamed and started running towards the residence of her son, John Kobyluk, who lived on the same farm not far from the residence of the defendant and his wife. The defendant fired another shot which knocked the top off of a wooden rail gate. He then caught up with Mrs. Kobyluk and struck her several savage blows with the gun and with a plank which he had seized. He knocked out three of her teeth and broke one of her arms and knocked her into unconsciousness. When Mrs. Kobyluk regained consciousness she made her way across a field half a mile to the home of the Eckroats. The Eckroats laid her on a blanket, and called the officers and also procured an ambulance to take her to the hospital.

Noah Richmond, deputy sheriff of Oklahoma county, testified that he and Jack Driver were notified of the shooting and drove immediately to the Kobyluk farm; that as they arrived the drivers of an ambulance were loading Mrs. Kobyluk into an ambulance; that they then drove to the Kobyluk home and called for the defendant, who came out of the house; that the officers had a conversation with defendant in which they asked him where the gun was which was used in the shooting, and defendant took them to the garage and showed them where he had placed the gun in a corner of the garage and had put a board over it to conceal it; that the weapon had blood upon it from the breach to the end of the barrel; that the defendant showed them where he stood outside of the house by the window and fired at his wife, and in response to their question as to who all was implicated in the shooting he said, "no one but myself"; that when they first questioned defendant he stated he shot his wife because she had a hatchet and was going to kill him, but that after he had showed them where he had stood when he fired the shot and where she was sitting, the defendant changed his story and said he had fired the gun because his wife had run him crazy for the last seven years; that defendant had changed his clothes and his hands were clean, indicating that they had been washed; that the clothing which defendant had worn at the time of the altercation was found in the bedroom; that defendant was nervous and on the way to town inquired of the officers how much his fine would be and stated he wanted to pay his fine and get it over.

Mrs. John Eckroat testified that she and her husband had lived in half a mile of the Kobyluks for 21 years; that on the night Mrs. Kobyluk was shot they heard a shot fired and a woman's voice scream for help and then everything quieted down; that about 15 minutes later she heard a voice call for help from her son's yard; that she and her daughter-in-law ran to the fence and found Mrs. Kobyluk covered with blood and dirt from head to foot; that they fixed a pallet for Mrs. Kobyluk to lie on on the lawn and her daughter-in-law telephoned for an ambulance and the sheriff. John Eckroat and Mr. and Mrs. Henry Eckroat testified to substantially the same facts that were related by Mrs. John Eckroat.

Mrs. Nellie Ramsey, the 29 year old daughter of defendant and Mrs. Kobyluk, testified that she had been married eight and one-half years and lived in Bartlesville; that she came to her parents' home often during that period to visit; that her last visit was on August 13, 1948, which was the day after Mrs. Kobyluk had gone to Claremore; that her father was angry at her mother because it was going to cost $80 a week for room and board while she was at Claremore; that she observed her father quarrel with her mother many times in recent years. A few months before the shooting incident her father commenced complaining about a meal and finally he began throwing dishes at her mother; that about two years before the shooting she was present and a quarrel arose between her father and mother over the mowing of the lawn, during which her father said, "I will kill you", and, "I can kill you and get away with it because I am

an old man and I am nervous and they will never do anything to me"; that she had also seen her father pound her mother over the head so many times in later years that she could not recall each of them. On cross-examination she stated that both of her parents would engage in the quarrels but that defendant always started them first.

It was stipulated that if the doctor who had attended Mrs. Kobyluk were present he would have testified that the injuries she sustained on September 15, 1948, were as follows:

"1. A fracture of the skull.
2. A fracture of the right elbow.
3. Multiple gunshot wounds at the upper part of the body.
4. Shock.
5. Loss of three teeth.
6. Multiple contusions and abrasions about the head and body."

Mr. and Mrs. John Kobyluk, the son and daughter-in-law of defendant, testified in his behalf that they lived on the Kobyluk farm about a city block from the home of Mr. and Mrs. Paul Kobyluk. Mrs. John Kobyluk testified that she heard one shot which sounded like it came from down by the orchard back of a neighbor's barn, then a short time later another shot which sounded like it was out in the yard, and then she heard a voice say, "John, John, get a doctor"; but she did not recognize the voice; that her husband ran out of the barn to get in the car to go get a doctor; that she grabbed her little boys and started running toward her own house; that she did not see either Mr. or Mrs. Kobyluk that night. She further testified that during the time she was around Mr. and Mrs. Kobyluk she could not understand all they were saying because they always conversed in a foreign tongue. It developed from the evidence that Mr. and Mrs. Paul Kobyluk had come to this country from Ukraine and that they spoke broken English which at times was difficult to understand.

Mrs. John Kobyluk testified that she had heard fussing between her husband's parents but that she never did see Mr. Kobyluk strike Mrs. Kobyluk; that Mr. Kobyluk had been in ill health for many years from about 1942; that he had sinking spells and would ofttimes faint; that one night about 2 or 3 o'clock defendant came to their house and pecked on the bedroom window and hollered for John, and her husband said, "what's the matter" and he said he wanted to talk to John as he had been walking down by the river and he thought that if he could talk to John it might relax him where he could feel better; that that happened about four years before the shooting occurred; that in August before the shooting occurred she saw the defendant come out of his yard with a milk bucket about 3 o'clock in the afternoon and inquired as to why the cows weren't at home, and when informed that it was not time to milk he sat down and commenced to cry.

It developed from the testimony of this witness and also from that of John Kobyluk that after the shooting occurred the defendant had deeded all of his interest in the farm to his son, John, and the farm had become quite valuable because of the discovery of oil.

E. R. Maupin testified that he was the closest neighbor to the Kobyluks, living about 135 yards south of their residence; that he had known them about ten years and never heard of any trouble in the family; that their reputation in the community was good; that about ten days before the shooting he saw Mr. Kobyluk over at his place; that he was stooped and could hardly walk, and stated that he had been sick, and seemed to be very nervous.

John Kobyluk testified to substantially the same facts as related by his wife. He further testified that he had heard frequent quarrels between his parents about money and other things but that he did not know of any threats made by either against the other; that nearly every time he was at their home they seemed to be quarreling and his mother acted like she started it; that for the past few years he had been driving his parents to town or wherever they might want to go as neither of them could drive; that starting in February, 1942, his father commenced to be sick and after that time he could not work in the field as he had done before; that his mother continued to work in the field; that one time in July, 1942, while he was working in the field, his wife came to him and said that his father was dying; that he ran to where he had fallen and found his father shaking and very nervous and out of wind; that he continued to have similar spells until 1944. That in 1944 he commenced taking treatments from Doctor Lingenfelter, and showed considerable improvement. He related the milking incident and the time when his father came to his house about 2 o'clock at night in substantially the same manner as was related by Mrs. John Kobyluk. At the time of the shooting the witness was in the barn milking the cows; that he heard a shot which sounded like it was across the river, and then he heard another shot and screams and heard both his father and mother, and he went out of the barn and couldn't see anybody; that he ran out to get a car to drive to a neighbor's house and call the sheriff; that he drove up to Mrs. Eckroat's, and Mrs. Eckroat said "your mother is here", and Mrs. Eckroat said that they had called the sheriff and an ambulance, so he got in his car and went back to his home.

The defendant testified that he became ill in 1942; that in 1944 Doctor Lingenfelter started giving him some medicine and he took this medicine continuously up until the time of the trouble; that his wife was bothered with female trouble and she would pick up a chair and throw it on the floor and make him nervous; that they quarreled nearly every day and he put up with it because he thought when she got older she would do better; that on September 2, 1948, his wife returned from Claremore; that he had been awful sick; that she commenced to quarrel with him and wanted him to give her a deed to all their property, and that they quarreled in the kitchen and she hit him with both her fists; that he was sick and nervous and could hardly walk; that after that nearly every day she would give him a punch on the head and would call him a devil, and that he was so sick with rheumatism and nervous that he would cry; that he had the headache; that on some days he would feel like his head was as big as a balloon so that he didn't know what was happening; that his wife told him on Monday that now that they had plenty of money from the oil lease she was going to take a visit every three months as long as the lease money lasted; that he went to see Doctor Lingenfelter on September 7th and got some more medicine from the Doctor; that his wife commenced building a chicken coop for son John and wanted him to help, and he said he couldn't and they started quarreling; that she said, "Why don't you die if you are sick?" When questioned concerning the shooting he said, "I don't remember nothing at that time." He testified that he remembered being in the Coyne Campbell Clinic and stayed there about seven weeks during which he gained 30 pounds. On cross-examination he said he remembered seeing a bunch of cars in the yard of his house the night of the shooting, and some policemen came.

Doctor Coyne Campbell and Doctor Harold Sleeper testified as expert psychiatrists on behalf of the defendant. Doctor Coyne Campbell, being the owner of the Coyne Campbell Clinic, which is a hospital for the treatment of mental diseases, testified that on the morning of September 18, 1948, defendant was brought to the hospital. At that time, according to the testimony of the doctors, defendant "seemed to be confused, his tongue was thick, and he began

to cry, he had pellagra, and was very nervous"; that they took a bromide test and found that he had two hundred and thirty milligrams of bromide in his blood, and anything more that one hundred and fifty bromides in the blood begins to make a man not responsible for his acts. The doctors testified that defendant was mentally unstable because of the bromide poisoning; that he remained in the hospital for several weeks and improved greatly. Counsel for defendant asked Doctor Campbell a long hypothetical question, to which the doctor stated:

"A. Well, I would rather answer that by saying that Mr. Kobyluk, himself, told me that he had been rather nervous for the past seven year. The Court: Doctor, that isn't responsive to the question. A. What is it? The Court: He asked you for your professional opinion. A. Well, not all those things, themselves, are true. The Court: Doctor, assuming those facts are true, whether they are or not, but assuming them to be true. A. All right, assuming that these things are true, it barely insinuates that the man has been suffering with a rather severe nervous disorder for quite some time."

Doctor Forrest M. Lingenfelter testified that he examined the defendant for the first time on August 7, 1944 and the last time on September 7, 1948; that he gave him a prescription of medicine for his ailments, which medicine contained sodium bromide among other ingredients, for the purpose of relieving him of nervous tension; that he saw no notable change of condition throughout the years; that the defendant had a nervous disease and the medicine was for the purpose of giving him comfort and relief; that once or twice during the years he was under treatment he changed his medicine, and that at the date of the last treatment, on September 7, 1948, he started giving him B-1 and luminol, which had no bromide in it. When specifically asked concerning the bromide solution contained in the medicine which he had prescribed as to whether over a period of years it could accumulate to the extent which could cause bromide to be in the blood as testified to by Doctors Campbell and Sleeper, he testified that it was in the realm of possibility. On cross-examination the Doctor testified that he had difficulty understanding the defendant when he would make the examination, for the reason that the defendant could hardly speak English and the Doctor could not speak Ukrainian; that he changed medicines five or six times during the period of illness to prevent an accumulation of bromide in his system.

The first assignment of error is that the court erred in admitting evidence of acts of defendant and alleged threats made 13 years before the act for which defendant is being tried. In support of this assignment of error counsel for defendant referred to the direct examination of Mrs. Paul Kobyluk in which she related that commencing in 1935 defendant seemed to become more abusive and quarrelsome. However, on cross examination, Mrs. Kobyluk corrected the date to 1945. Her testimony in this respect was as follows:

"Q. If these things happened in 1935, it was really in '45, wasn't it; 1945? A. Did I say '35? Q. Yes? A. It was '45. Q. Instead of '35; so, these things you testify to, happened since 1945, wasn't it? A. Yes, it was 1945."

We think that evidence of the actions, conduct, and general demeanor of defendant toward his wife, showing a continuous course of abuse from 1945 until the date of the alleged assault in 1948, was competent as tending to show the state of mind of defendant at the time of the assault. Seals v. State, 92 Okla. Cr. 272, 222 P. 2d 1037; Hicks v. State, 70 Okla. Cr. 284, 106 P. 2d 136; Jackson v. State, 84 Okla. Cr. 138, 179 P. 2d 924. It should be borne in mind that the only issue in this case was the question as to whether defendant knew right from wrong at the time of the shooting, and in this respect the defendant himself testified concerning his physical condition from the year 1942 to the date of the trial, and described his associations with his wife during that period, which covered an even longer period of time than that testified to by the wife.

Complaint is also made as to evidence concerning what Mrs. Kobyluk said at the Eckroat home shortly after the shooting concerning her son John. We think probably too long a time had intervened between the time of the assault and when this statement was allegedly made for it to have been considered a part of the res gestae, but counsel for both parties questioned several of the witnesses concerning the attitude and demeanor of John Kobyluk toward his mother. When the state sought first to inquire concerning what Mrs. Kobyluk said at the Eckroat place, objection was made to the question and sustained by the court. As the defense counsel had questioned his own witnesses at length concerning this alleged occurrence at the Eckroat home, the Eckroats were called in rebuttal to testify to what was said in the presence of John Kobyluk by his mother after she had managed to make her way to the Eckroat's place after the shooting. The defense had sought to show by the testimony of Mr. and Mrs. John Kobyluk that John had done all in his power to assist his mother and that there had been nothing said by his mother on that night in John's presence to intimate that she was afraid of John. Specific inquiry was made by counsel for defendant of John concerning any alleged statement by his mother at the Eckroat's and John denied that any statement was made by his mother intimating that she was afraid of John. By the nature of the defense testimony it was competent for the Eckroats to testify in rebuttal concerning what Mrs. Kobyluk said when her son John approached her at the Eckroat home shortly after the shooting. Furthermore, the only defense was insanity and the evidence if inadmissible would have been harmless for the reason that it had no bearing on the sanity of the defendant. If defendant was sane the jury could render no verdict other than that of guilt, and if he was insane such testimony could not have affected the issue. However, in view of the testimony of John Kobyluk, we think this evidence was admissible in rebuttal for impeachment and as bearing upon the question of the interest of John Kobyluk in the case.

The principal contention presented for reversal, and the only one which has substantial merit, is the contention that the evidence established the insanity of the defendant and therefore the verdict of the jury was contrary to the evidence. In this connection counsel state, "when a fact has been proved, which fact is decisive of the issue before the jury, and that fact has not been denied by any evidence or placed in controversy, then that fact is binding upon the jurors". This statement has reference to the testimony of the psychiatrists who examined the defendant three days after the assault occurred in which they stated that the defendant's blood showed a bromide content of two hundred and thirty milligrams and that any blood content of one hundred and fifty milligrams or over is sufficient to cause a person to not be responsible for his actions. It is further contended that before the issue of defendant's insanity could be given to the jury it was necessary for the state to make an issue of that particular fact by evidence, and since the state did not introduce any evidence to show that the bromide content of defendant's blood was less than that testified to by the doctors, nor to contradict the statement of the doctors that a bromide content of one hundred and fifty milligrams or greater was sufficient to make a person insane, that the defendant's insanity was conclusively proved to where the jury under the record would not be justified in finding that the accused was sane.

We have carefully read the testimony of the doctors and have hereinabove given a substantial summary of their evidence. At no time were the doctors asked, either by counsel for the state or counsel for defendant, as to whether in their opinion the defendant knew right from wrong at the time of the alleged assault. Many of the questions asked were confusing to the doctors and certainly were confusing to the jury. It may have been that the doctors' testimony concerning the insanity of the accused pertained solely to what is generally termed

medical insanity, which succinctly stated means any mental derangement or confusion in the mind of the accused, or, as one of the doctors said, a condition which prevents the party from orienting himself; while the insanity which excuses one from suffering the consequences for the commission of a crime is whether the defendant had sufficient reason to distinguish between right and wrong. 21 O. S. 1941, § 152; Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Cunningham v. State, 70 Okla. Cr. 131, 105 P. 2d 264, 269.

In Cunningham v. State, supra, this court stated:

"the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act."

As we view this record, the question of the sanity of the accused presented an issue for the determination of the jury under proper instructions. There was competent evidence based upon the testimony of the wife and daughter that the accused had quarreled and threatened his wife over a period of several months and that he became jealous of her and made false accusations of infidelity. The defendant testifying in his own behalf admitted that he quarreled with his wife and that she did many things which made his home life unpleasant, such as nagging at him about going on trips and about handling of their money. The defendant's conduct in hiding the gun in the garage and covering it with a plank, and of discarding his bloody clothes and putting on clean clothes before the officers arrived, and his testimony to the officers at the time of his arrest that, "John had nothing to do with it, I did it all myself", were facts which the jury had a right to consider as bearing on the issue of his sanity at the time of the alleged commission of the crime. They were not bound to accept the testimony of the doctors if they saw fit to give more weight to the facts which indicated the accused knew right from wrong at the time the shot was fired.

There is no complaint that the instructions were improper. While we are convinced that defendant was under an emotional strain and probably suffering from a mental disturbance, we are not of the opinion that the proof showed the defendant was unable to distinguish right from wrong at the time of the commission of the crime, and the verdict of the jury upon this issue is approved.

We cannot agree that the punishment is excessive. If the defendant was sane, then the penalty of ten years was certainly very light. He is very fortunate that his acts did not take the life of Mrs. Kobyluk.

The judgment and sentence of the district court of Oklahoma county is affirmed.

BRETT, P. J., and POWELL, J., concur.