Albert Eugene **TARTER**, Plaintiff in Error,

v.

**STATE** of Oklahoma, Defendant in Error.

No. A–12883.

Court of Criminal Appeals of Oklahoma.

Feb. 1, 1961.

As Corrected Feb. 6, 1961.

Hegel Branch, Sullivan & Baucum, Duncan, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

This is an appeal by Albert Eugene Tarter, defendant below, plaintiff in error herein. Tarter was charged in the district court of Stephens County, Oklahoma by information with the crime of murder, allegedly committed by him on June 24, 1959 in said County, affected against Roby Jesse Hall by shooting him with a .22 automatic pistol, inflicting certain mortal wounds resulting in his death on said date. He was tried by a jury, convicted and his punishment fixed by the jury at a term of life in the penitentiary. Judgment and sentence was entered accordingly, from which this appeal was perfected.

Briefly, the facts in this case, a considerable part of which are covered by stipulation, disclose the following:

The defendant Tarter came upon his victim, Roby Hall, in the town of Loco, Oklahoma, in the middle of the afternoon of June 24, 1959 while Hall was playing dominoes with some friends, and shot him without warning.

It appears there were about twenty entry and exist wounds located as follows: upper left forearm two, upper left chest two; entry wound in left side of the abdominal area about three inches above the hip joint exiting through the back about the belt line; entry wound in left side near left hip joint, and the balance apparently confined to the legs.

The domino game was being played by James W. Alexander; Ray Reynolds, L. W. Marsh and the decedent Roby Hall. During the shooting Alexander exclaimed, "For God's sake, Albert, don't shoot him any more". Tarter replied, "Bill, the damned gun is jammed anyway".

After the shooting, witnesses testified the defendant Tarter exclaimed to Roby Hall, "This will teach you to break up my home", and in a few seconds he was in his car and gone.

Hall did not expire immediately, but died on the way to the hospital in Wichita Falls, Texas.

L. W. Marsh related substantially the same detail of facts, except that he said Hall replied to Tarter, "You got the wrong man".

Another eye witness, James Edmondson, testified substantially to the same effect, and on this the State rested.

The defense was, "Not guilty by reason of insanity".

There was much evidence for the defendant to the effect that he had been a law-abiding citizen for the many years he had lived in and around Loco. Much of the evidence offered by various witnesses established that several years before this tragic incident the defendant became highly emotional, crying a great deal. He had severe headaches. At the inception of these attacks he wanted his wife near him, but this later developed into a resentment for her, and he began to feel that she had been unfaithful to him. The occasion for this re-

sentment arose in 1952, just before Christmas, when both the Halls and the Tarters were in Duncan doing shopping. Mrs. Tarter and Mr. Hall got out of pocket, and Mr. Tarter and Mrs. Hall met and discovered their mutual dilemma as to spouses. Mrs. Hall, a jocular person, remarked, "Well you don't think they could be out together?" This remark was accepted as a joke until the defendant began to have headaches and crying spells in 1956, then the ridiculous remark became a reality to him.

All during this time the defendant Tarter was under the care of physicians and psychiatrists, from those in and near Loco to some from Waco, Texas, and Coyne Campbell Sanitarium in Oklahoma City. His mental condition was apparent to his family and friends up to the date of the killing. Members of his family were supported by his friends, doctors and psychiatrists on the question that he was insane at the time of the killing, and did not know right from wrong.

Dr. Oliver J. Haag of Waurika testified that he treated the defendant for male menopause. He admitted he missed the boat completely. The defendant, he said, should have had a sanity hearing before the killing occurred. He testified defendant was most irrational on the supposed infidelity of his wife, which infidelity was unsupported by everyone who knew them. It appears to have been a complete figment of the imagination.

Dr. Frank Stickney, osteophathic physician and surgeon, of Comanche, Oklahoma, testified that he had treated the defendant for his nervousness and mental condition. That it was his opinion that the defendant was insane the day he killed Roby Hall, and had been for some time, as well as at the time of trial.

Dr. Stanley M. Kemler, physician and psychiatrist and clinical director at Central State Hospital, Norman, Oklahoma, testified the defendant was suffering from involitional psychosis or depression, and did not know right from wrong at the time of the alleged murder.

Harold G. Sleeper, M.D., psychiatrist and neurologist, said he treated defendant at the Coyne Campbell Sanitarium in May of 1958. He testified that defendant was suffering from psychotic depression, "involving loss of contact with reality, or a lessening of the ability to tell what is real and what one imagines is real", or thinking which is delusional or not real in nature. He testified defendant did not know the difference between right and wrong.

Alfred A. Hellams, M.D. psychiatrist, related that the defendant shot Roby Hall because of delusional thinking; that he was psychotic and did not know the difference between right and wrong at the time of the killing.

With this evidence, the defendant rested, not taking the stand in his own behalf.

Thereafter the State offered rebuttal testimony. James M. Alexander, an eye witness, testified the defendant in his opinion knew the difference between right and wrong at the time of the shooting. So, also, did L. W. Marsh and James Edmondson, brother-in-law of the deceased Roby Hall and who were eye witnesses to the killing.

Mrs. Southerland, a neighbor, testified on rebuttal for the State that following the killing, Tarter appeared at her home and wanted her husband to take over his lease for a few days, saying that he "had just filled Roby Hall's belly full of lead." She gave it as her opinion that he did know the difference between right and wrong at that time.

Deputy Sheriff John Gentry and Sheriff Eldon Head, both testifying as to the defendant's conduct at the time of the arrest shortly after the shooting, testified the defendant answered, when asked what was the matter with him: "He guessed he got so mad or lost his head." Deputy Gentry further related that not only then but when they were taking Tarter to the county jail and heard over the radio that Hall was dead, the defendant said he did not intend to kill him, he "only wanted him to suffer as he had suffered."

The Sheriff specifically testified that before news of the death came over the radio, he asked the defendant why he did it, and he said, "He kept tantalizing me. I just couldn't stand it any longer, I just had to shoot him". The Sheriff said he asked Tarter if he knew Roby might die, and Tarter replied, "No, I didn't intend to kill him, I just shot him in the legs", and repeated, "I wanted him to suffer as I have suffered."

All the way to Duncan he said the defendant seemed to feel that what he had done was right and felt good about it. When news came that Hall was dead, the defendant said, "Oh, my God", and began to cry.

The Sheriff further testified he had observed the defendant in his jail, to and from Norman, and after his return, and that such observation was, in substance, the basis for his opinion that the defendant knew right from wrong.

 This, in substance, was the evidence resulting in the jury's finding of guilt. Their verdict is not supported by the medical proof, but only by that of a few lay witnesses on the question of insanity at the time of the shooting. Nevertheless, it was within their province to believe the testimony of the lay witnesses to the disregard of the medical testimony, if they chose to do so. The law makes no distinction in weighing evidence between expert testimony and evidence of other character, and it is for the jury and not the reviewing court to determine the weight to be given such evidence. Kobykuk v. State, 94 Okl. Cr. 73, 231 P.2d 388; Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646; Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812; Alexander v. State, Okl.Cr., 305 P.2d 572.

Under these conditions we are bound by the jury's finding concerning this issue of fact, since that is a matter for their determination. Even though the evidence is conflicting, it presents a matter solely for the determination of the jury. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479.

The defendant's first contention is that the trial court erred in not instructing the jury on the lesser offense of manslaughter in the first degree.

In this connection he complains that the trial court instructed the jury in instruction No. 3, that "The information in this case as applied to the evidence herein, includes only murder, and your verdict will be either guilty of murder, or not guilty."

To this instruction the defendant excepted. He urges that he was entitled to an instruction on first degree manslaughter, since the State's own evidence shows that the defendant did not intend to kill deceased, but intended to shoot him in the legs and make him suffer as the defendant had suffered.

Under the provisions of 21 O.S.A.1951 § 701, homicide is murder when committed with a premeditated design to effect the death of the person killed.

Section 711 of the same Title provides that homicide is manslaughter in the first degree when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon.

It appears from the foregoing delineation of the testimony of the State's own witnesses that premeditated design to kill may have been lacking in this case, and that the killing was in a heat of passion in a cruel and unusual manner, by means of a dangerous weapon. In fact, we are confronted with the fact that this is not a violent assumption.

The point is urged that the defendant waived this objection by failing to submit the instruction in writing. It is sufficient that he did raise it, and did object and except to the giving of the trial court's instruction No. 3.

 In Mayberry v. State, 94 Okl.Cr. 301, 238 P.2d 362, 366, this Court, in the body of the opinion said:

"While the evidence would have sustained a conviction for murder we are of the opinion that it was not reversible error for the trial court to give an in-

-struction on first degree manslaughter. In Welborn v. State, 70 Okl.Cr. 97, 105 P.2d 187, in syllabus 1 * * * this court said:

" 'In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, whether it be requested on the part of the defendant or not, *and it is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the first degree.'* * * *" [Emphasis now supplied.]

█ In fact, we have gone so far as to hold in such situations the trial courts should give the defendant the benefit of any doubt which the evidence may suggest, and instruct the jury on the law of each degree which the evidence tends to prove, whether requested or not it is the trial court's duty so to do. Smith v. State, 59 Okl.Cr. 111, 56 P.2d 923; Smith v. State, 83 Okl.Cr. 209, 175 P.2d 348; Tucker v. State, 66 Okl.Cr. 335, 92 P.2d 595, holding that if there is any evidence that would reduce the crime from murder to manslaughter the trial court should instruct on manslaughter in the first degree.

█ On this point the defendant relies upon Jewell v. Territory, 4 Okl. 53, 43 P. 1075, 1077, wherein it was said:

" * * * the homicidal act must be done with a premeditated design to effect the death of the person killed, or some other person. The premeditated design to effect death is the material element of the offense, and must exist at the time the homicidal act is committed, or there is no murder. It is not sufficient that the fatal shot was fired premeditatedly, for this only implies that the act is done in pursuance of a prior determination. This may be true, and yet the shot have been fired for the purpose of maiming or disabling the injured party. * * * And one may shoot at another with malice afore-

thought, intending only to break his pistol arm, or disable him, yet with no design to effect the death of the person he desires to injure."

█ Where the evidence as here creates a reasonable doubt that the killing was committed with premeditated design to effect death, the proper exercise of discretion should direct the giving of an instruction on manslaughter.

In Tucker v. State, supra, quoting from Updike v. State, 9 Okl.Cr. 124, 130 P. 1107, 1110, it was said, among other things:

" 'This vests the matter of the instructions to be given in the discretion of the trial court. It is true that this discretion is subject to review upon appeal, but it will not be disturbed unless the record presents a clear case of abuse of discretion.' "

We are of the opinion that under the State's own case, an instruction on first degree manslaughter should have been given. This, however, is one of those cases requiring the indulgence of reasonable doubt in favor of the defendant hereinbefore referred to. Without it, the jury had no other alternative than to find the defendant guilty of murder. Under the immediate facts surrounding the killing, we can readily appreciate the trial court's hesitation to instruct on first degree manslaughter, but mature consideration dictates such an instruction should have been given.

█ On this point the Attorney General urges that notwithstanding the evidence supports the defendant's contention relative to an instruction on manslaughter, the crime would still be murder, being a homicide "perpetrated without any design to effect death by a person engaged in the commission of any felony under 21 O.S.1951, § 701, sub. 3"

This argument does not apply herein, for the reason, as was said in Jewell v. Territory, supra [4 Okl. 53, 43 P. 1075]:

"Homicide is murder, under the third sub-division, 'when perpetrated without any design to effect death, by a person engaged in the commission of

any felony'; and this means some felony as defined by statute other than that of the killing itself."

In State v. Fisher, 120 Kan. 226, 243 P. 291, at page 293, on this point it was said, in the body of the opinion:

"It is the contention of the state that if murder is committed in the perpetration or the attempt to perpetrate any other felony it is murder in the first degree; hence, that if the boy, John Michael Foley, met his death at the hands of defendant while defendant was committing an assault with a deadly weapon, under such circumstances that it amounted to a felony under any statute pertaining thereto, the offense is murder in the first degree. This contention cannot be sustained. The effect of it would be to make any homicide, not excusable or justified, which, by our statute, is defined to be manslaughter in any of the degrees or murder in the second degree, to constitute murder in the first degree. In other words, there could, under this interpretation of the statute, be no such thing as any lower degree of homicide than murder in the first degree."

New York's statute on homicide was copied almost verbatim by Oklahoma, Jewell v. Territory, supra. In People v. Wagner, 245 N.Y. 143, 156 N.E. 644, 646, the New York Court said:

"We think it self-evident that the trial judge committed error when he charged that the killing of Peter Basto may have been effected while the defendant was engaged in a felonious assault upon him, and, basing their conclusion thereupon, might determine that the defendant was guilty of murder in the first degree. If this were not error, then every intentional killing, by means of a dangerous weapon, regardless of deliberation and premeditation, would constitute the crime of murder in the first degree, since every such killing must be preceded by the direction of such a weapon against the body of the person killed, which in itself would constitute a felonious assault. The law is clear, however, that the precedent felony must constitute an independent crime not included within the resulting homicide. People v. Huter, 184 N.Y. 237, 77 N.E. 6; People v. Spohr, 206 N.Y. 516, 100 N.E. 444."

Hence it clearly appears the State's contention on this point is without merit. We are of the opinion it was fundamental error for the trial court not to have instructed on first degree manslaughter under the evidence at the trial.

Second, the defendant seeks to obtain a review of certain alleged errors which he contends occurred during the proceedings to determine the question of present sanity, or his ability to make a rational defense. This testimony covers 312 pages in the first volume of the record. Drs. Kemler, Hellams and Stickney and four lay witnesses testified defendant was incapable of making a rational defense. The State presented six lay witnesses to the contrary. The foregoing contention is based upon certain alleged errors as to admission and exclusion of evidence.

The State takes the position that such matter is not the subject of review on appeal. It takes the position that such must be true, since the same is in the nature of a special proceeding, civil in nature, not involving any question of guilt or innocence, but is a collateral or interlocutory issue. The State's position is partially supported by the case of Weiland v. State, 58 Okl.Cr. 108, 50 P.2d 741, 744 (but only as to the nature of the proceeding), wherein this Court said:

"The trial of the question of present sanity is in the nature of a special proceeding not involving any question of guilt or innocence, but a collateral issue. The court here followed the civil procedure, that is, he ruled and instructed that the burden was on the defendant on that issue, and that he was entitled to the opening and closing in

presenting his testimony and in the argument, and further ruled and instructed that nine of the jurors might return a verdict. His ruling was in conformity to the statute regulating the procedure in such cases. Sections 3214, 3215, Okla.Stat.1931 [22 O.S.1951 §§ 1164, 1165], as well as in conformity to the general rule, 16 C.J. p. 791, § 2017; 14 R.C.L., Insanity, § 59."

This position is further suggested in State v. Gibson, 15 N.J. 384, 105 A.2d 1, 3, 42 A.L.R.2d 1461:

"The proceeding to test the sanity of a criminal defendant after indictment and prior to trial is of ancient origin and has never been considered a criminal proceeding or a step in the criminal cause. It is in the nature of an inquest trying a collateral issue. 1 Hale 33; 39 and 40 Geo. III, c. 94; 1 Russell on Crimes (9th ed., Greaves), p. *30; 1 Archibold's Criminal Pleading and Practice, p. 42; 1 Roscoe Criminal Evidence, supra; 4 Chitty Blackstone p. *25; 1 Wharton's Criminal Law (12th ed.), sec. 76, p. 102; Nobles v. State of Georgia, 1897, 168 U.S. 398, 18 S.Ct. 87, 42 L.Ed. 515.

"The proceeding at the common law was in the nature of an inquest to determine the sanity of the defendant and if he were found to be insane, to commit him to an institution for the criminal insane until such time as his sanity returned and he could be put to trial."

The State also relies on Pena v. State, Tex.Cr.App., 320 S.W.2d 355 to the same effect, holding that no appeal lies from such proceeding.

This point is one of first impression in this Court, but we are impressed with the reasoning in the dissenting opinion in State v. Gibson, supra, 105 A.2d at page 5, 42 A. L.R.2d at page 1467 as follows:

"The ultimate object of a murder trial is to determine the guilt or innocence of the defendant. Whether he can be put to trial and is answerable is frequently raised by a plea of insanity.

This occurred in the instant case and the majority opinion dissects the criminal cause, carves a portion of it from the whole and classifies the section so severed as a civil proceeding while admittedly everything else is criminal.

"Such a procedure, in my analysis, is not founded upon either sound logic or intelligent reasoning and its effect on future murder cases, where the jury returns a verdict of insanity, is of the utmost importance.

"No one disputes that an indictment for murder is disposed of by a criminal trial. The arrest, the arraignment, the custody, the plea, the presentation to a grand jury, the indictment returned, the plea to that indictment and the motion to quash, if any, the various motions in reference to the indictment, if made, the drawing of a special panel of jurymen to sit at the trial—every detail, every step, every incident, every phase relates to and is part of a criminal cause."

 We are of the opinion while the proceeding on the issue of present sanity has been held in the nature of a collateral or interlocutory civil proceeding, it definitely arises as a result of the criminal information or indictment lodged against the accused, and constitutes an essential ingredient of the whole matter for the determination of the criminal proceeding. The determination of that issue goes to the primary requisite of jurisdiction. Under the provisions of 22 O.S.1951 § 1161, a person presently insane cannot "be tried, adjudged to punishment, or punished for a public offense, while he or she, as the case may be, is insane; *. * *." Hence, if a person is presently insane, he is not subject to trial. By what strain of logic can it be said that the determination of the trial court's jurisdiction must be made separate and distinct from the whole proceedings in a criminal case? The primary determination of the court in any case is whether or not it has jurisdiction. Moreover, to create a condition in law where this determination is not subject to review seems to us to be

absolutely untenable. We must never be a party to enthronement of arbitrary or capricious action in the trial proceedings. To hold that determination of jurisdiction would not be subject to review would be to establish such a precedent. Our statutes do not provide for an appeal from an intermediate order made in the progress of the case, but an appeal in a criminal case "may be taken by the defendant, as a matter of right from any judgment against him; and upon the appeal, any decision of the court, or intermediate order made in the progress of the case may be reviewed." 22 O.S. 1951 § 1051.

This Court has consistently held that such is the rule in every criminal case. De Wolf v. State, 96 Okl.Cr. 380, 255 P.2d 949; State ex rel. Boatman v. Payne, 97 Okl. Cr. 48, 257 P.2d 842; Fogle v. State, 67 Okl.Cr. 146, 93 P.2d 19, and many other cases so holding.

To permit a direct appeal from such intermediate order would result in indefinite delay in the trial on the merits, and thwart the administration of justice. People v. Cornelius, 332 Ill.App. 271, 74 N.E.2d 900, 902;

> "The reason why no appeal or writ of error should lie to review an order of the circuit court finding the defendant sane upon a preliminary hearing is because the order is interlocutory and to permit a person to appeal from such an order would be to delay the trial of the charges in the indictment. A defendant, awaiting trial upon an indictment, could have a hearing and the jury return a finding that the defendant was sane. If then there is a right to have judgment entered on that verdict reviewed, the trial upon the charge in the indictment would necessarily be postponed until a reviewing court had passed upon the question and thus the administration of justice would be thwarted for an indefinite term."

■ With this we agree, but such delay under our statutes, would never arise, since the appeal is from the final judgment, inclusive of the determination of the jurisdictional question of present sanity. This holding neither does violence to the procedure established by law, nor works delay. It does obviate the possibility that when a jury or the trial court, as the case may be, acting arbitrarily or capriciously in the determination of the issue of present sanity, could without evidence reasonably tending to support its finding on that issue of fact, force a blank idiot to stand trial for any offense, contrary to the statute. 22 O.S. 1951 § 1161. We cannot say that such situation will never develop. To so hold would require us to ignore the facts of life. Strong men move juries to do things that mature reflection would not approve. We know of no statute in Oklahoma prohibiting our conclusion, and can find no basis in logic to refute it. Who will be hurt if review is afforded from a determination of the issue of present sanity on an appeal on the merits from the final judgment? However, we must note that the determination of present sanity is a determination of a question of fact, subject to review on appeal, only for the purpose of ascertaining whether there is any competent evidence reasonably tending to support the finding of the jury on the question of present sanity. The appellate court's inquiry must be so restricted and limited for that sole purpose, and none other. So far as the issue of present sanity is herein involved, there is some competent evidence reasonably tending to support the finding of the jury in the trial of that issue below, and where such is true, the same will not, for that reason, be reversed, vacated or set aside on appeal. The contrary would require a reversal of the case for lack of jurisdiction.

The defendant's third proposition is predicated upon the trial court's order overruling defendant's motion for an instructed verdict, after both sides had rested. In view of what we have said hereinbefore, this matter being directed to the sufficiency of the evidence on the whole proceeding, is without substantial merit.

■ The defendant's fourth proposition relates to the fact that the State in its

cross-examination of Mrs. Tarter sought to lay the predicate for impeaching rebuttal testimony on purely collateral matters. Certain questions were asked concerning her knowledge that her husband had a gun and kept it for use against her and her former son-in-law, James Goodwin. Her answers to those questions were in the negative. So, also, was the question relative to defendant having a gun for use against Roby Hall. Negative answers were also obtained concerning her having gone to Dallas to escape so much talk about Mr. Tarter and Mrs. Poe. To questions concerning her giving Mrs. Hightower reason to believe Mr. Tarter was jealous, a negative answer was obtained. Likewise negative answers were obtained on cross-examination concerning her having said to Mrs. Hall and others that she didn't know whether Mr. Tarter's condition was nervousness or just the Tarter temper. Negative answers were repeatedly obtained as to this issue. These were all collateral matters not permissible of proof in the State's case in chief, and the State was bound by the answers. Thereafter, witnesses were sworn and gave impeaching testimony. Objection was interposed and overruled to a considerable portion of this rebuttal. In one other place, motion was made to strike such testimony. However, there were a few occasions when no objection was made. We are of the opinion that sufficient objections appear in the record to firmly establish the error complained of, and call it to the trial court's attention. The rule is announced by Underhill's Criminal Evidence, 5th ed., vol. 1, p. 582, § 239, as follows:

"The rules above discussed, regulating the introduction of inconsistent declarations for the purpose of contradicting a witness, permit him to be contradicted as regards matters relevant only to the guilt or innocence of the prisoner, and not collateral or irrelevant matters. Where the witness is confronted with contradictory or inconsistent declarations made out of court and pertaining solely to irrelevant matters, and he denies that he is their author, his replies are conclusive. He cannot be contradicted on that point by the party seeking to impeach him."

To the same effect the rule is announced in Wharton's Criminal Evidence, 12th ed. vol. 2, p. 356, § 525:

"A party who cross-examines a witness on collateral matters for the purpose of testing his credibility as a witness is bound by his answers and cannot contradict his testimony on a collateral issue. The object of cross-examination in a collateral matter is to enable the jury to comprehend just what sort of person they are called upon to believe; but because the character of the witness is collateral to the main issue, which is the guilt or innocence of the defendant, the party cross-examining is bound by the answer of the witness on the collateral matter."

In Fleetwood v. State, 95 Okl.Cr. 163, 241 P.2d 962, 974 we followed these eminent authorities in pronouncement and approval of that rule. Therein we said:

"A witness may not be impeached by showing contradictory or inconsistent statements by him in respect of collateral, irrelevant or immaterial matter, and where on cross-examination witness has denied making a statement as to a collateral, irrelevant, and immaterial matter, cross examiner is bound * * * by the answer, and may not introduce evidence to prove that the witness did make the statement which he denied making."

In the body of the opinion we quoted with approval the early case of Willis v. State, 13 Okl.Cr. 700, 167 P. 333, 336, as follows:

"When a witness is cross-examined on a matter collateral to the issue his answer is conclusive and cannot be subsequently contradicted by way of impeachment by the party putting the question. * * * The test of whether a fact inquired of in cross-examination is collateral is this: Would the cross-examining party be entitled to

prove it as a part of his case tending to establish his plea? "

In the Fleetwood case, supra, we cited Freels v. State, 18 Okl.Cr. 456, 195 P. 1094; Phillips v. State, 20 Okl.Cr. 415, 203 P. 902; Scott v. State, 50 Okl.Cr. 396, 298 P. 626; Hall v. State, 51 Okl.Cr. 50, 299 P. 508; Clark v. State, 95 Okl.Cr. 119, 239 P.2d 797.

And see also Payne v. State, 10 Okl.Cr. 314, 136 P. 201, 204, wherein among other things it was said, "If it was collateral, it was not competent to contradict it."

In Tippit v. State, Okl.Cr., 332 P.2d 222 we discussed the rule further and cited numerous other cases in support thereof. Among the cases cited was Hall v. State, 51 Okl.Cr. 50, 299 P. 508, wherein it was said, in substance that if the matter is prejudicial it is reversible error.

We are of the opinion that this rebuttal on collateral matter was prejudicial and reversible error, when considered in light of other matters raised herein.

The defendant's fourth contention is that the trial court should have given his requested instruction No. 4, instead of its instruction No. 8. This contention is without substantial merit, since the instructions are substantially the same in import. Moreover, the instruction given by the trial court has been twice approved in similar instructions and we are of the opinion the giving of instruction No. 8 should be sustained. Roe v. State, 17 Okl.Cr. 587, 191 P. 1048; Tittle v. State, 44 Okl.Cr. 287, 280 P. 865.

The sixth contention of the defendant is that the trial court erred in overruling defendant's demurrer interposed at the conclusion of all the evidence. This contention has been virtually overruled by force of the conclusion contained in discussion of the present sanity hearing and discussion of the facts herein involved.

Other points were urged but we do not deem them of sufficient import to discuss them.

We are of the opinion that only for the reasons of the failure of the trial court to instruct on the lesser offense of first degree manslaughter, and errors committed in permitting rebuttal testimony to impeach Mrs. Tarter on purely collateral issues, this case must be reversed and remanded for a new trial, not inconsistent with the views herein expressed. This we regret, but there is no other alternative, since both errors were highly prejudicial to the defendant's substantial rights.

It is so ordered.

NIX, P. J., and BUSSEY, J., concur.