James **PLUMLEE**, Plaintiff in Error,

v.

The **STATE** of Oklahoma, Defendant in Error.

No. A–15345.

Court of Criminal Appeals of Oklahoma.

Sept. 1, 1971.

Holmes Colbert, Sulphur, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Donald E. Herrold, Asst. Atty. Gen., for defendant in error.

## OPINION

BRETT, Judge.

Plaintiff in Error, James Plumlee, hereinafter called defendant, was charged in the District Court of Murray County, Oklahoma, with the crime of Murder, substantially in the following language, to-wit:

"That the said James Plumlee did on the 5th day of September, 1968 unlawfully, wilfully, maliciously, intentionally and feloniously, without authority of law and with the premeditated design upon the part of the said defendant to effect the death of a human being, towit: one Horace Roper; and did stomp and pummel the said Horace Roper with his feet and further did strike him on and about the face and body with hands and fists and an unknown blunt instrument; and did then and there inflict in and upon the said Horace Roper certain mortal wounds, from which said mortal wounds the said Horace Roper did and there languish and die, etc."

Defendant was found guilty of First Degree Manslaughter, and was sentenced to sixty (60) years imprisonment.

The evidence contained in the record reflects that the defendant and the victim, Horace Roper, were next door neighbors, and that the defendant was Roper's landlord. The altercation, which the State claims resulted in the victim's death, appears to have begun in defendant's home, September 4, 1968. Both men had been drinking heavily on that day, and some-time between 2:00 o'clock and 4:30 o'clock p. m., Roper went next door to defendant's home, in an intoxicated condition. The two men appeared to be talking, but when their conversation reached a certain point, Roper hit the defendant in the face twice, and each time knocked him down across the bed. Defendant testified that Roper reached for a knife, and so he hit him one time which knocked him unconscious. Roper was taken next door to his house, and within a few minutes came outside again.

Mr. Coll, a State's witness, testified that defendant stomped Roper about the head and face with his bare feet, but another State's witness, Mr. Ervin, testified that he did not see the defendant stomping Roper. Four of the witnesses testified that when the fight ended, Roper had a trickle of blood coming from his right ear; and that the defendant's nose, or his lip, was bloody. Roper was ambulatory thereafter; he claimed to be all right; his appearance seemed to verify that fact; and he refused medical attention only minutes after the fight.

Shortly after sunset, Roper was seen trying to awaken defendant, who was asleep in his own front yard. Defendant testified that after Roper woke him up, he went into his house, locked the door and went to bed.

Two of the State's witnesses, Mr. Burkhart and his mother, Mrs. MayBelle Laughlin, lived across the highway from defendant's house. They testified that they heard a loud voice, shortly after midnight on September 4, 1968, coming from the direction of defendant's house. Mrs. Laughlin testified that she recognized defendant's voice when he said, "Leave me alone, or I'll knock the G– –damned hell out of you!" Her son was unable to recognize defendant's voice, but related that he heard the statement and said, "I heard someone in a drunken, in slurred words hollering at somebody." He related the distance between the two houses was about half a football field, or about 50 to 75 yards. Mrs. Laughlin was asked on cross-examination, "How many voices did you hear

down there?" She answered, "I would say there was three or four voices."

The next morning the District Attorney's Special Investigator, Mr. Wayne Warthen, investigated the scene in front of defendant's house where the body was found. Among the items discovered, and preserved as evidence, was a portion of the concrete front porch slab to defendant's house. That portion of the porch had a spot of blood on it, so it was chipped out and sent to the laboratory for analysis. That analysis revealed that the blood was the same type blood as that of the deceased. The investigator also found defendant's pipe laying in the vicinity of the dead body, along with some foot-prints which appeared to have been made by someone in their stocking feet. There was no evidence of a struggle, but it was shown that defendant was in his socks, without shoes, that particular day.

Consequently, this evidence—coupled with the testimony of Mrs. Laughlin and her son, Robert Burkhart, concerning the voices coming from the direction of defendant's house shortly after midnight—raises some question of a second incident of some nature; or the possibility that the deceased fell on the front porch; or that he was knocked down on the porch, which could have accounted for the skull fracture revealed by the autopsy. The record is devoid of any explanation or clarification for the voices heard by Mrs. Laughlin and her son. The defendant denied that he saw the deceased again, after he went into his house, until about 4:00 o'clock a. m., when he went outside to go to the bathroom, and found him dead in the front yard. If defendant's story is not to be believed, and Mrs. Laughlin's testimony is believed, then what prompted defendant to say, "Leave me alone, or I'll knock the G— —damned hell out of you!" —as the witnesses testified. Also, if defendant went out to the body to learn, whether or not Roper was dead, that would account for his footprints. The investigator related that it did not appear that a struggle took place where the body was

found. It appears very clear that what occurred, happened on defendant's property; and except for the testimony of "stomping," the most convincing and incriminating evidence appears to be that which was found in the vicinity of the dead body.

The Information charging the crime of Murder specifically alleges that defendant "did stomp and pummel * * * with his feet," and "did strike him on and about the face and body with his hands and fists and an unknown blunt instrument; * * *." That allegation was supported mainly by the testimony concerning the fight in the afternoon, and the doctor's testimony explaining the autopsy report. No evidence whatsoever concerning a blunt instrument was introduced. It was the doctor, who introduced the testimony concerning a "blunt instrument," which in his opinion he said, could have been the defendant's bare feet. The doctor's testimony did not seem to relate to anything connected with the evidence of blood found on defendant's front porch, except that death occurred between midnight and 3:00 o'clock a. m.

In describing the findings of the autopsy the doctor related: "We had a fractured skull, on the left area here (indicating) and had blood on top of the skull, underneath the scalp and blood underneath the skull, between the skull and the brain. And had bruises about this area here and here (indicating) and had fractured ribs 1, 2, 3 and 4, and blood in the right chest. And a severe bruised area here (indicating) with blood all behind the breastbone. And blood through the mediastinum, which is the area between the lungs, in which the tubes from the mouth, and airway and stomach tubes go down. The tubes to your lungs and to your stomach, they all reside in this mediastinum. There was blood all through that. What we call it is a hematoma. It is a collection of bleeding, is what it amounts to. And he had a torn liver, or lacerated, cut liver. * * * He had about two to three pints of blood in the abdomen and there was blood into the part that holds the colon up and blood all

down behind the abdominal cavity, called the retroperitoneal blood. It means behind the abdominal cavity, all down in this right side, down here (indicating)."

As we review the record of trial, it appears that this conviction for First Degree Manslaughter, was sustained by: 1: Evidence of a fight; 2: the autopsy report explained by the doctor; and, 3: any other evidence and testimony the State could find.

The State did not attempt to connect the testimony concerning the "midnight voices" and the front porch "blood spot" with that of the earlier fight between the two men. And yet, the deceased apparently started the first fight in defendant's own house, on the afternoon of September 4th; and, if the State's evidence is correct the deceased further harassed the defendant on his property later that afternoon and again late that night. Consequently, we conclude that the evidence tends to warrant an instruction on Second Degree Manslaughter, as defendant argues in his brief. The court did not give such instruction and none was requested, except for the objection to the court's fourth instruction, to which exceptions were allowed.

In his brief, defendant complains of the court's fourth instruction, because the jury was, in part, instructed as follows:

"* * * there is no evidence in this case which shows, or tends to show, manslaughter in the second degree and that degree of homicide will therefore not be defined to you in these instructions. You are further instructed that there is no evidence in this case which shows, or tends to show, excusable homicide, and therefore that degree of homicide will not be defined to you herein."

Title 21 O.S.1961, § 731, defines excusable homicide, in part as follows:

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

Defendant asserts the court committed error in giving that instruction, and eliminated the instruction for Second Degree Manslaughter. Second Degree Manslaughter is defined in 21 O.S.1961, § 716; and, in substance provides: that any killing—which is not Murder, First Degree Manslaughter, Excusable or Justifiable Homicide—is Manslaughter in The Second Degree.

In Hodges v. State, 65 Okl.Cr. 277, 85 P.2d 443 (1938), this Court considered the death of a man, older than the defendant, who was in an intoxicated condition and who slapped the deceased with his hand and deceased fell and broke his neck. In that case the defendant was sentenced to seven years imprisonment, which on rehearing was modified to four years. In the dictum of that decision, this Court said:

"The defendant was charged with the crime of murder. It was not only proper, but the duty of the court, under the facts, to submit to the jury the question of manslaughter in the first and second degree." 85 P.2d at page 445.

In the instant case the facts are devoid of any premeditated intent on the part of the defendant to cause the death of Roper; consequently, it was the duty of the trial court to submit the matter to the jury on the lesser degrees of homicide. Likewise, the instruction on First Degree Manslaughter was proper; however, under the court's instructions the jury had only First Degree Manslaughter to consider—once the murder element was eliminated. In addition, the court's instructions eliminated "excusable homicide"; and for all practical purposes, it would appear that by eliminating that degree of homicide, the court nullified the second part of the definition of First Degree Manslaughter which caused it to read as follows:

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or

by means of a dangerous weapon; unless it is committed under such circumstances as to constitute [excusable or] justifiable homicide."

Palmer v. State, 78 Okl.Cr. 220, 146 P.2d 592 (1944), was an appeal considered by this Court which also concerned a fight between two men. One of the errors cited in that case was the trial court's failure to give an instruction in Second Degree Manslaughter. In Palmer, this Court stated:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not."

In Tarter v. State, Okl.Cr., 359 P.2d 596 (1961), this Court recited:

"[I]t is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the first degree." (at page 601). See also: Welborn v. State, 70 Okl.Cr. 97, 105 P.2d 187.

In Isaac v. State, 83 Okl.Cr. 33, 172 P.2d 806 (1946), an appeal containing facts very similar to the instant case in which Isaac was charged with First Degree Manslaughter, it was held to be reversible error for the court to fail to instruct in Second Degree Manslaughter, and also assault and battery, whether the defendant requested the instructions or not. While the Isaac case has not been generally cited, it followed this Court's decision in Palmer v. State, supra. See also: Johnson v. State, 59 Okl.Cr. 283, 58 P.2d 156 (1936); Mead v. State, 65 Okl.Cr. 86, 83 P.2d 404 (1938); Miles v. State, 41 Okl.Cr. 283, 273 P. 284 (1928); and Moore v. State, 48 Okl.Cr. 106, 289 P. 788 (1930).

Defendant's third specification of error asserts that the trial court committed error when his Motion for Continuance was denied, because one material defense witness failed to appear to testify. Mrs. Alice Ervin had been subpoenaed by defendant to testify. When she was called to give her testimony, her husband informed the court that she was in the hospital. This occurred at 4:30 p. m., just prior to the close of defendant's case.

When it became known that the witness was not present, defense counsel orally requested a continuance. The State objected to the granting of a continuance because no affidavit was presented by defendant, and only the word of Mr. Ervin was offered. The State's objection was sustained, so defense counsel read into the record the substance of the missing witness's testimony. It was asserted that Mrs. Ervin went with defense counsel to defendant's house; and that they found the deceased's knife where defendant said he had put it. Thereafter, the defense rested and the state introduced the testimony of two rebuttal witnesses. The first was the Justice of the Peace who showed by the court records that ten years earlier defendant plead guilty on two misdemeanor offenses of assault and battery. The second witness was Sheriff Roady, who identified a statement that had been written by Investigator Warthen and read to Mr. Ervin, who signed it on September 6th, since Mr. Ervin could neither read nor write. The State rested, and the court then adjourned for the day permitting the jury to separate and go to their homes.

Considering the circumstances and the time of the day, there is little doubt that it would have been more reasonable for the court to have granted defendant's request for continuance. Defense counsel appeared to have been surprised at the absence of the material witness, and it appears reasonable that her testimony might have supported defendant's contention that Roper had a knife, when defendant struck him on the afternoon of September 4th. Who

is to deny that the testimony of the knife might have caused the jury to believe that the defendant was telling the truth; and that he did not strike the deceased until he saw him with the knife, since other state witnesses denied seeing a knife. Without the missing witness, defendant had no supporting testimony. This seems especially pertinent insofar as defendant was faced with a capital offense; and considering that the court did adjourn shortly after the request for continuance was made. We can only consider this to have been an abuse of judicial discretion, because much of the State's case revolved around the afternoon fight between the two men.

With reference to defendant's complaint concerning the trial court's instruction to the jury on "good time" and other credits as provided in 57 O.S.Supp.1969, Section 138, this contention is effectively confessed by the Attorney General on the basis of this Court's decision in Williams v. State, Okl.Cr., 461 P.2d 997 (1969). Under the facts of this case, when one considers the sentence imposed by the jury it is obvious that the jury must have been overly influenced by that instruction and the prosecution's argument which followed.

Therefore, for the reasons of the improper jury instruction, and the abuse of judicial discretion which prevented this defendant from receiving a fair trial according to due process of law, we are of the opinion that this conviction must be reversed and remanded for a new trial on the charge of First Degree Manslaughter. Under the circumstances as they exist, it is not necessary that comment be made on defendant's complaint that the jury was permitted to separate.

It is therefore ordered that James Plumlee be granted a new trial on First Degree Manslaughter.

NIX, J., concurs.

BUSSEY, P. J., concurs in result.